LA SALLE NATIONAL TRUST, N.A., Successor Trustee to La Salle National Bank, not Indiv. but as Trustee, *et al.*, Plaintiffs-Appellees and Cross-Appellants and Separate Appellants and Separate Appellees, v. THE VILLAGE OF WESTMONT, Defendants-Appellants and Cross-Appellees (The Gray Group, Inc., Defendant-Appellant and Cross-Appellee and Separate Appellee; Boulevard Bank National Association, Defendant-Appellant and Separate Appellant and Separate Appellee).

Second District   Nos. 2—93—0804, 2—93—1070, 2—93—1107 cons.

Opinion filed June 29, 1994.

44

46

Charles H. Braun and Michael S. Friman, both of Horwood, Marcus & Braun, Chartered, of Chicago (James H. Ryan, of counsel), for appellants Village of Westmont and The Gray Group, Inc.

Michael Weininger, of Katz, Randall & Weinberg, of Chicago (Barry A. Erlich, of counsel), for appellant Boulevard Bank National Association.

Diane I. Jennings, of Lord, Bissell & Brook, of Chicago (Robert J. Pugliese, of counsel), for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

These consolidated appeals arise from a dispute over the zoning and use of a parcel of land located in the Village of Westmont (Village or Westmont). The defendants, Westmont and The Gray Group, Inc. (Gray), seek review of an order of the circuit court of Du Page County which overturned the rezoning of the parcel, which is owned by Gray,

and enjoined the defendants from developing the site as single-family residences. Plaintiffs, who own property adjacent to the rezoned site, cross-appeal from the trial court's findings regarding the alternative grounds on which they sought relief from the rezoning. Plaintiffs also appeal separately from orders favorable to defendants, Gray and Boulevard Bank National Association (Boulevard or Boulevard Bank), in plaintiffs' action for recovery of sums claimed to be due pursuant to a covenant running with Gray's property and for enforcement of lien rights against the property. Defendant Boulevard Bank also appeals separately from an order dismissing its counterclaim.

The background facts of all three appeals are the same. In 1983 the estate of Paul Butler owned a 144-acre site in Westmont. The entire site, which was vacant except for a horse barn, was zoned for residential use. The estate engaged property development consultants to devise a plan for the use of the property which would maximize its value. Although they considered residential use, the consultants ultimately conceived a mixed-use commercial development. They sought to integrate an upscale hotel, serving the corporate, transient, and resort trade, with a golf course and business offices. The hotel and golf course were to be developed first in order to increase the value of the land designated for office development. In turn, it was foreseen that the offices would create demand for hotel rooms and other services. Carson Pirie Scott (Carsons), which had experience in operating two other resort developments in the Chicago metropolitan area, agreed to guarantee long-term financing. Carsons and the estate then moved toward development of the hotel and golf course.

The 16.9-acre parcel slated for business offices (office site) was retained by the estate and was to be developed later as a separate venture of the estate. However, the planning for the office site and the hotel and golf course proceeded as a unified, cooperative effort by Carsons and the estate. This included planning for physical connections, such as covered walkways, between the hotel and the future office buildings, as well as shared vehicular access, landscaping, signage, and parking facilities. The estate informed Carsons that it did not have a date certain for constructing the office facilities and that office development would occur only as dictated by the market. According to the witnesses who were representing the estate at the time, they told Carsons it could take from 5 to 10 years to bring offices to the site.

When the unified plan was presented to it, the Village of Westmont was receptive and encouraging. With professional planning assistance from Du Page County, the Village created a special business zoning district to apply to the property. On November 19, 1984, the

Village rezoned the 144-acre site, placing it in the new "B-3 Special Development District" classification, which allowed only business uses. The Village also approved a preliminary concept plan for the entire 144 acres as well as a final concept plan for the hotel and golf course. While there was not as yet any final concept plan for offices, the preliminary concept plan provided that the office site could include up to three 10-story buildings.

With the B-3 zoning in place, Carsons and the estate entered into a number of agreements which enabled them to seek financing and start construction. A joint venture, BC Venture, was created to hold the beneficial interest in the hotel land, take a long-term lease from the estate on the golf course land, and operate the hotel/resort. The estate, which contributed the land for the hotel, placed the legal title to the property in La Salle National Trust (La Salle), as trustee. Carsons guaranteed the venture's financial obligations to its lender. The joint venturers were, for Carsons, CPS Hotel Management Services, Inc. (CPS) and, for the estate (and the heirs of the Butler estate), Butler Hotel Associates, Ltd. (BHA), a partnership. BHA also held the beneficial interest in the golf course land, while legal title to the property had been placed in a separate trust at La Salle. Carsons and the estate also put in place an easements, covenants and restrictions agreement (Agreement or Easement Agreement), which granted cross-easements on all three sites—hotel, golf course, and office—for access, utilities, storm water retention, and the like. La Salle, BC Venture, CPS, and BHA were the original plaintiffs in this action.

BC Venture secured $49 million in financing for the development, and the Oak Brook Hills Hotel and Golf Course opened in April 1987. Due to subsequent asset transfers, corporate restructurings, and, ultimately, bankruptcy, Carsons' guaranty obligations came to rest on Dial Corporation. Dial had purchased most of the nonretail assets of Carsons late in 1987 in a stock purchase transaction. Included in the transaction, among other liabilities, was the Carsons guaranty. Late in 1992 Dobbs Houses, Inc. (Dobbs), a subsidiary of Dial Corporation, assumed the interest of CPS Hotel Management Services in BC Venture. Dobbs then became a plaintiff in the action.

Although the hotel and golf course were now open, there were no takers for the office site during the next few years. In October 1987 the estate encumbered the property with a mortgage in favor of Boulevard Bank. The mortgagors subsequently defaulted and, late in 1991, Boulevard foreclosed and took title to the site. Shortly thereafter, the bank contracted to sell the land to defendant Gray, a residential development company. The contract was contingent on the rezoning of the parcel. Gray, which hoped to build upscale, empty-

nester residences on the land, immediately applied to Westmont to rezone the property accordingly. At the zoning hearings, plaintiffs expressed their opposition to any residential use on the office site. Nevertheless, in March 1992, at the conclusion of the public hearing process, the Village approved Gray's application and adopted Ordinance 92—9 (Westmont, Ill., Ordinance 92—9 (March 16, 1992)), which rezoned the property to planned development with underlying R-4 classification, for residential development. The Village subsequently approved Gray's plan for 84 detached, single-family homes on the former office site, with access and storm water detention provided on the hotel site and golf course. In May 1992 plaintiffs filed an action for declaratory and injunctive relief.

Plaintiffs' amended complaint consisted of seven counts, the first six alleging the invalidity and/or ineffectiveness of the rezoning, and the seventh count alleging a breach of the Easement Agreement by defendants Gray and Boulevard. In a second-amended complaint, plaintiffs added counts VIII and IX, alleging lien rights with respect to the office site. In August 1992, Boulevard filed a counterclaim seeking a declaratory judgment that the rezoning to residential was valid. However, shortly before the date set for trial, Boulevard's counterclaim was dismissed, as were counts I through VI of the complaint, as to Boulevard.

Ultimately, counts VII, VIII, and IX were severed, and counts I through VI were tried before the bench. The court found in favor of plaintiffs only on count III, which had alleged that the rezoning was unconstitutional. The remaining defendants, the Village and Gray, prevailed on all the other counts. Subsequently, the trial court granted defendants' motion for summary judgment relative to count VII, as well as their motion to dismiss on the pleadings relative to counts VIII and IX. The first appeal and cross-appeal arise from the issues resolved at trial. The second appeal is from the disposition of the last three counts of the complaint. The third appeal stems from the dismissal of Boulevard's counterclaim.

## APPEAL NO. 2—93—0804

Defendants Westmont and Gray appeal from the trial court's determination that Westmont's ordinance No. 92—9, which applied residential zoning to the office site, was unconstitutional. A zoning ordinance is presumed to be valid, and the party challenging the presumption has the burden of establishing by clear and convincing evidence that, as to the subject property, the ordinance is arbitrary, capricious, and unreasonable, and bears no substantial relationship to the public health, safety, or general welfare. *Harvard State Bank*

*v. County of McHenry* (1993), 251 Ill. App. 3d 84, 85; *Tim Thompson, Inc. v. Village of Hinsdale* (1993), 247 Ill. App. 3d 863, 872.

■ In determining the validity of a zoning ordinance, the following factors are generally considered: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished; (3) the extent to which the destruction of property value of the plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as opposed to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; (6) the length of time the property has been vacant as zoned considered in the context of land development in the area; (7) the care with which a community has undertaken to plan its land-use development; and (8) community need for the use proposed by the plaintiff. (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378; *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47; *Thompson*, 247 Ill. App. 3d at 872.) While no single factor is controlling, and each case must be decided on its own facts (*Harvard*, 251 Ill. App. 3d at 86), of paramount importance is the existing use of surrounding property and whether such use is uniform and established. (*La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309; *Harvard*, 251 Ill. App. 3d 86; *Thompson*, 247 Ill. App. 3d at 873.) Illinois courts examine and attempt to balance these factors in order to determine whether the zoning in question is fair to the owner of the subject property, owners of surrounding properties, and the public. *Harvard*, 251 Ill. App. 3d at 86.

As in other cases, in zoning cases the trier of fact is in a better position than the reviewing court to determine the credibility of the witnesses and their opinions. (*La Salle National Bank*, 12 Ill. 2d at 48; *Glenview State Bank v. Village of Deerfield* (1991), 213 Ill. App. 3d 747, 759.) Hence, the trial court's findings of fact on zoning issues will be overturned only if they are against the manifest weight of the evidence. *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 318; *Glenview State Bank*, 213 Ill. App. 3d at 759.

■ With regard to the most important factor, the existing uses and zoning of nearby property, the 16.9 acres of land which were rezoned (hereafter subject site) abut the east side of the hotel property. Along with the 16.8-acre hotel property, the subject site is located toward the center of the larger, 144-acre parcel which had previously been placed in the B-3 special development district classification. The golf course, which makes up the bulk of the remaining 110 acres, surrounds the hotel and the subject site. (See figure 1.) Property to the west of the 144-acre parcel is zoned and

used for residential. However, this property is separated from the 144 acres by Cass Avenue, which one of the witnesses described as a four-lane highway with speed limits of 35 to 40 miles per hour. Thus, the subject site is separated from those residences, first by the hotel, then by the golf course, and finally by a significant, heavily travelled roadway. (See figure 1.) The property to the north is also zoned and used for residential, but it is separated from the 144 acres by 35th Street, which is referred to in an appraisal of the property as a "secondary thoroughfare." Once again, the subject site is separated from the residential areas by both the golf course and an improved street. The property abutting the east edge of the 144 acres is primarily residential, while to the south the property is zoned for business and manufacturing uses. These last two uses are separated from the subject site only by the golf course. (See figure 1.) On the east, the golf course was originally intended to serve as a buffer between the hotel and office uses, and the residential use. There is evidence in the record that when Westmont considered the plan which led to B-3 zoning, it wanted the hotel to be separated from residential areas by the width of at least two fairways.

On these facts the trial court found that the existing uses and zoning of property near the subject site were commercial, meaning the hotel and golf course, rather than residential. At defendants' request, the trial court had viewed the 144 acres and had walked the perimeter of the subject site. In her order, the trial judge specifically stated that, on inspection, she noted that the hotel and golf course were the predominant use of surrounding property. The court also observed the separation effected by Cass Avenue and 35th Street. The court summarized that the "overwhelming presence" in the area was the hotel, together with its associated uses.

Defendants insist the trial court erred by looking only at the hotel and golf course, which were the uses immediately adjacent to the subject site. They maintain the court should have looked farther and given more weight to the residences surrounding the entire 144-acre parcel. We find no error.

First of all, it is clear from its order that the trial court was well aware of the residential uses in the vicinity of the 144 acres. Therefore, we reject defendants' suggestion that the court did not consider these areas. Moreover, we do not agree that the lower court failed to give sufficient weight to the presence of the residential neighborhoods. What the court was faced with was a 144-acre parcel that had been zoned, in its entirety, for commercial purposes, with the most intensive commercial uses deliberately grouped together in the middle of the acreage and deliberately surrounded by the least

intensive uses. While no development has yet occurred on the subject site itself, the remainder of the 144 acres has been developed commercially, and the subject site remains identified with and oriented toward those commercial uses.

The 16.9 acres which make up the subject site are surrounded by 127 acres of commercial development in the form of the hotel and golf course. The entire west side of the subject site directly abuts the hotel property. Specifically, it backs up on to the hotel parking lot and the hotel tennis courts. The only access to the subject site is via the road which also serves the hotel. (See figure 1.) In contrast, due to the intervening golf course, the subject site is distinctly separated from and without access to the single-family homes to the east. We find highly significant the trial court's description that the "overwhelming presence" in the area of the subject site is the hotel and its associated uses. Our own perusal of the exhibits, and particularly the aerial photos of the entire 144 acres, affirms the lower court's impression. Under the circumstances, we find the subject site to be cloaked much more heavily with the character of the commercial uses than that of even the closest residential use.

Moreover, in our opinion, the adjacent uses are entitled to considerably more weight than the more distant residential uses to the north and west. The subject site, to a large extent, is isolated from those residential areas, if not by the significant expanses of intervening golf course, then certainly by Cass Avenue and 35th Street. When the subject site and all of the surrounding uses are considered in their overall context, and in relation to one another, it is evident that the trial court's finding, that the existing uses and zoning of nearby property is commercial, is not against the manifest weight of the evidence.

The evidence presented is of little help in weighing the second, factor, *i.e.*, the extent to which property values are diminished. Defendants acknowledge the theoretical plausibility of plaintiffs' contention that office development on the subject site would add more to the value of the businesses of the golf course and hotel than would residential development. However, as they are quick to point out, the site is presently vacant. The trial court cited "considerable testimony" regarding the adverse effects of residential development upon the existing hotel and golf course. Most of this testimony, however, concerned complaints which would probably be received from future residents of the subject site about the routine activities and normal operations associated with a resort hotel and golf course.

The witnesses foresaw complaints about such things as errant golf balls causing injury or damage; noise, lights, and fumes

emanating from the premises; and golfers trespassing on private property. The trial court correctly characterized these as "anticipated" adverse effects, but noted testimony from plaintiffs' witnesses which reflected that similar complaints were received from adjacent residential users at two similar hotel/golf course complexes operated by Carsons. Defendants nevertheless describe these "anticipated" complaints as highly speculative and point out that plaintiffs did not elicit testimony regarding adverse effects from present residents living adjacent to the golf course, some of whom lived there before the hotel and golf course were built.

■ While the existing residents did not testify, there was evidence from the hotel employees that numerous complaints had been received. Even the Village acknowledged receiving at least one complaint regarding an errant golf ball. More significantly, though, testimony about anticipated adverse effects is not particularly helpful since, as the trial court observed, there was no evidence showing that the general fact of rezoning to a residential use generally, or that adverse effects specifically, would actually result in lower property values for the hotel and golf course. There was testimony that continuing complaints and differences with residential neighbors might affect the operation or profitability of plaintiffs' businesses, but we do not believe such testimony showed a negative effect on the plaintiffs' actual property value.

Finally, we agree with the trial court's observation that, while decrease in property value caused by zoning restrictions is to be considered, the property would be worth more if the zoning were reclassified is not determinative, since this would be true in virtually all zoning restriction cases. (See *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 595.) In sum, while this factor is not decisively unfavorable to plaintiffs, neither does it provide substantial support for their challenge to the zoning ordinance. It is entitled to little weight in our analysis.

With regard to the third factor, the extent to which the negative effect on the value of plaintiffs' property promotes the public welfare, the trial court squarely found for plaintiffs. In fact, the court concluded that it was nearly certain that the combination of the hotel/golf course uses with the proposed residential use would produce a negative effect on the health, safety, and welfare of the public. After reviewing the record, we find that the evidence supported the lower court's conclusion.

■ Much of the testimony pertained to safety risks. Thompson Dyke, plaintiffs' expert, testified regarding standards for the space which should be maintained between golf courses and residential ar-

eas. Current guidelines called for a minimum of 150 feet between the center line of the fairway and residences, while pending guidelines, which were to be adopted in 1993, required a minimum distance of 210 feet. Of the 84 homes proposed for the subject site, 28 lay less than 210 feet from the center of a fairway. Those 28 homes were within foreseeable range of misplaced golf balls.

Richard Weber, the hotel manager, indicated that the majority of the golfers who played the course were not serious golfers but played for social and job-related reasons. Randy Bolstad, the PGA professional at the golf course, testified that 26,000 rounds of golf were generally played on the course during the golf season. The official starter at the golf course, Jim Palmer, estimated that 20% of the balls hit off the first tee go into the 17-acre subject site, and that most golfers go onto the property to retrieve their balls. Similar to Weber, Palmer indicated that many of the golfers on the course do not control the ball. Defendants attack the testimony of the hotel and golf course employees regarding safety risks as "absurd" and self-serving. However, where there is a conflict in the testimony, it is for the trier of fact to determine the credibility of the witness and their opinions and to determine the weight to be given their testimony. (*La Salle National Bank*, 12 Ill. 2d at 48; *Glenview State Bank*, 213 Ill. App. 3d at 759.) We find that the trial court properly performed these tasks in the case before us.

Randy Bolstad also testified about the charging of the batteries in the golf carts. The carts, 65 in number, are all recharged in the evening, starting between 8 and 10:30 p.m. It can take up to five or six hours to fully charge the batteries. Bolstad described the sound of the recharging as annoying and a humming or buzzing sound which can be heard from a distance when they are all going at once. The trial court stated that, when it viewed the property, it could hear the sound of the charging mechanism, which "was indeed an obnoxious buzzing sound." Trial exhibits show that the charging area is located within a few feet of the rear yards of the proposed homes.

Richard Weber testified regarding the operation of the hotel. The facility is open 24 hours a day, 365 days a year, and has banquet facilities for 1,000 people. Weather permitting, the hotel tries to make use of its outdoor areas both during the day and at night. For large outdoor events and for additional banquet space, the hotel uses two tents, each one seating 200 people. These functions often have music and alcoholic beverages. The only thing which would separate the tents from the property of the single-family homes would be the tennis courts and the golf cart recharging area. Weber testified that when the tents are used the hotel receives complaints about noise

from residents on the east side of the golf course, even though these homes are approximately one-quarter mile away and are separated from the hotel by the golf course. The neighbors also complain about the lights from the tennis courts.

Collectively, we find the evidence more than adequate to support the trial court's conclusion that combining the proposed residential use with the hotel and golf course will have a negative effect on the public health, safety, and welfare. Defendants focus only on the evidence of the likelihood of future complaints, and assert, as they did with the second factor, that such evidence was too speculative to be given weight by the trial court. Defendants misconstrue the trial court's use of the evidence. Unlike factor two, where the court was concerned with the adverse effects of anticipated complaints on plaintiffs' property value, in its discussion of this factor the court did not concentrate on the potential for complaints. Rather, it dwelt, first of all, on those aspects of the existing situation—things which were actually happening—which would constitute safety threats to anyone living on the subject site. In addition the court emphasized those existing hotel/golf course activities and functions which would actually intrude on at least some of the residential properties merely because of their proximity to the resort facilities. These included not only golf balls, but also golfers, noise, light, and fumes.

Defendants claim the residents to the east have not complained, but point only to evidence that the Village had received only one complaint. This evidence does not really conflict with plaintiffs' evidence that the *hotel* had received numerous complaints. Even if it did conflict, however, it is for the trial court to resolve conflicts in the evidence, and we have no reason to set aside the lower court's apparent finding that the present neighbors have complained about the hotel and golf course.

We observe, too, that what is to be decided here is whether Gray's proposed residences should be allowed on the subject site. Since they are not already built, there is no way to determine the precise effect of the hotel and golf course activities on the homes. Therefore, it is necessary to determine what will most likely happen by using evidence of what is presently occurring on the vacant land as well as what has happened in similar situations, by physically viewing the relationships between the uses, and by applying reason and common sense. All of these the trial court did. Despite the negligible extent to which the evidence was speculative, the trial court gave it appropriate weight.

We note that defendants also urge that the subject site was always designed to house office workers and their cars and was always

to be surrounded by the hotel and golf course. However, there is a vast difference between three, 10-story office buildings and 84 single-family homes placed on 16.9 acres of land. Plus, there was evidence that it is easier to design office buildings to accommodate the risks posed by the golf course than it is to so design single-family, detached residences.

Factor number four concerns the relative gain to the public as opposed to the hardship imposed on the individual property owner. There is no dispute that residential development will generate real property taxes far in excess of what is now generated by the vacant land. Gray's evidence also projected payment of $354,000 in impact fees to the relevant taxing bodies. While the trial court acknowledged that the public would benefit from the receipt of greater tax monies and impact fees, it found that gain to be offset by the likely negative effect on the business activities of the hotel and golf course. In essence, the court found this factor to be relatively evenly balanced. The court's findings are supported by the evidence.

■ As we said earlier, defendants appear to concede that office development on the subject site would be more beneficial to the hotel and golf course than single-family homes. Under residential zoning plaintiffs lose even the potential, not only for the beneficial business offices which were originally contemplated, but also for any other commercial development which might be allowed in the B-3 district and might support the hotel and golf course. This hardship becomes more significant in light of evidence that, at the time it adopted the B-3 zoning which allowed office buildings on the subject site, the Village had been told that office development could take considerable time, meaning 5 to 10 years.

Furthermore, while evidence of actual loss of property value was not clear, other testimony showed that the safety and nuisance problems almost certain to arise from residential development would result in economic hardship to the business of the hotel and golf course. Richard Weber testified that these types of problems increase operating costs in that changes must be made in security require-ments. For example, a school located adjacent to the south-east corner of the golf course (see figure 1) threatened legal action when golf balls started flying onto their property. Fencing was, in fact, erected at the school site, as well as other locations, to catch misguided golf balls. Also, according to Weber, insurance costs go up. Significantly, Weber further indicated that when too many rules are imposed in or-der to alleviate these problems, the golf course generally becomes less attractive to golfers. Similarly, Thompson Dyke testified that problems with neighbors would ultimately cause the hotel to restrict

the use of its own outdoor areas, thus reducing its space available and ultimately its income. Dyke also mentioned that such problems become detrimental to the reputation of a golf course.

Finally, while defendants once again downplay the plaintiffs' evidence as speculative, and stress the property taxes to be realized from residential development, we note that receipt of tax revenues is not determinative. In *Concerned Citizens for McHenry, Inc. v. City of McHenry* (1979), 76 Ill. App. 3d 798, the primary justification for rezoning was the anticipation of an increase in the community's tax base. We called this justification "totally illusory" and said:

> "If the profit motive were the sole reason that zoning authorities varied their classifications, then any use whatsoever would be appropriate next to any other use so long as the maximum amount of taxes could be generated for the community's use." (*Concerned Citizens*, 76 Ill. App. 3d at 806.)

The trial court finding on factor four was not against the manifest weight of the evidence.

On the next factor, the suitability of the subject property for the zoned purposes, the trial court again found decisively for the plaintiffs. In our view, on this factor perhaps more than any other, the lower court was correct.

■ As the trial court noted, the hotel and its associated uses are the overwhelming presence in the area. Robert Gray, president of defendant Gray, testified that he planned to build upscale, single-family detached homes, with an average price in the area of $400,000. As we see it, the character of this kind of housing is not at all like that of the hotel. Even less upscale housing is not generally found abutting the parking lots and recreational facilities of a large hotel. We note again that under the original B-3 zoning the Village demanded that the golf course buffer the single-family homes to the east from the hotel and planned office buildings. The evidence is persuasive that, from the general point of view of intensity of uses, these two uses should not be side by side.

More specifically, we have already described many ways in which the proposed residential use would be incompatible with the commercial uses. There would be safety and nuisance concerns for the residents and, for the hotel and golf course, concerns about the inconvenience, nuisance, and expense of constantly pacifying the neighbors. Overall, it seems quite apparent that this 11-story hotel, which can accommodate 1,000 people at a time in its banquet facilities, and which is so geared to social and recreational activities, is not compatible with the single-family detached housing proposed for the adjacent site.

Defendants charge that the trial court totally ignored the evidence of how project design and ample buffering could insure the compatibility of the residential with the commercial uses. However, in light of the testimony of defendants' own expert witnesses, it is not surprising the lower court did not address such evidence.

Leslie Pollock, one of defendants' planning experts, testified that the subject site was suitable for residential zoning. The witness defended the proposed development, insisting that residential use would be appropriate, even though the hotel and golf course were already in place, because residential purchasers would buy their property with full notice of the nature of their surroundings. On cross-examination, however, he admitted that, if the residences had been built first, he would not support construction of a hotel, because of the compatibility issues. Pollock himself specifically singled out the magnitude of the hotel as such an issue. When asked about traffic, noise, lights, fumes, and introduction of transients into the neighborhood, he responded that, for many of those reasons he would not support a hotel of the size involved here. Pollock further acknowledged that he had not done a detailed review of Gray's plans to determine if it provided adequate space and buffers between either the residences and the hotel or the residences and the golf course. However, if he were planning the site, Pollock would put as much separation as possible between the hotel and the residential property.

Defendants' other planning witness, Joseph Abel, testified that the highest and best use of the subject site was residential. Abel also gave an opinion that the residential use could be made compatible with the commercial uses through placement of the homes, fencing, and landscaping. On cross-examination, however, Abel was not familiar with the noise involved in recharging the golf carts. Nevertheless, he believed the noise could be buffered from the homes 25 feet away by screening and landscaping. Abel was vague about the relevant standards for setting residential development back from golf courses. He considered them to be merely suggestions in the nature of design considerations, which apply equally to office and residential development. In this particular instance, Abel thought residential development would be more compatible with the hotel use than would office use. However, when asked whether, if he owned the hotel, he would rather have residential next door than office, he gave an evasive answer. In sum, the trial court finding that there was clear and convincing evidence that the subject site was unsuitable for single-family residential development is well supported by the record.

The next factor pertains to the length of time the property has been vacant as zoned, considered in the context of land development in the area. With respect to land development, the trial court indicated that it had heard ample testimony about the abundance of office space that had been developed in the area in the 1980's and about the present depressed state of nearby office markets. Defendants apparently interpret the meaning of this situation as "the total absence of any reasonable prospect of office development" on the site and again insist that rezoning to residential was appropriate because of the residential character of the area surrounding the 144 acres. However, we have already concluded that the subject site takes its character more from the immediately surrounding commercial uses than the distant residential uses. Hence, land development in the area, standing alone, is not compelling that the site should be residential.

As for the length of time the land has been vacant as zoned, the site was given B-3 zoning in 1984. Altogether, it had been vacant for only eight years before it was rezoned. More significantly, though, it is not disputed that, from the very beginning of the B-3 zoning process, it was understood by both plaintiffs and the Village that the hotel and golf course would be constructed before the office buildings. Minutes of a Westmont plan commission meeting reflect that a representative of the plaintiffs advised the Village that office development might not occur for as much as 10 years after construction of the hotel. Nevertheless, in 1992, five years after the hotel opened, the Village rezoned the property to residential. Thus, despite its awareness that office development could take up to twice the amount of time that had already passed, the Village acted to change the use of the subject site.

It is noteworthy, too, that in April 1990, Mary Linberger, an appraiser for defendant Boulevard Bank, appraised the subject site, and valued it at $3 million for either office or residential use. While Linberger testified that her appraisal was based on the near-term development potential of the property, the appraisal itself specifically notes that "[o]ver time the office appeal of this property should increase" and that "in time the subject site could have strong office potential."

■ Objectively speaking, the subject site was vacant for a relatively short time after the hotel opened, prior to rezoning. This fact, combined with the conduct of the Village and the indication that the market for office space might well improve, provided clear and convincing evidence that the site had not been vacant an unreasonable amount of time under the B-3 zoning. The trial court finding, therefore, was not against the manifest weight of the evidence.

■ The next factor is concerned with the care taken by the community to plan its land-use development. We acknowledge that Westmont's comprehensive plan originally contemplated residential development on the subject site. However, as the trial court noted, there was abundant evidence that Westmont planned very thoughtfully, very carefully, and very thoroughly before rezoning the site to a B-3 district. Development of the district required the drafting of an amendment to the Village zoning ordinance, an amendment which involved provisions for which there was little precedent. The Village sought the help of the Du Page County planning department in drawing up the new zoning classification. The evidence that the Village took great care in planning its land-use development, as reflected in the ordinances creating the B-3 district, is easily clear and convincing.

That the Village may have acted properly and held numerous hearings when it zoned the site back to residential does not undercut the care that went into planning for development in the B-3 district. Nor does it explain or mitigate Westmont's decision to make a drastic change in the B-3 district it had so recently created and which it knew could take a long time to fully develop. Notably, the zoning change also did away with the buffering of residential from commercial uses which had been so important to Village officials during the B-3 zoning process.

■ The eighth and final factor to be addressed pertains to community need for the use proposed by the plaintiffs. We think the trial court correctly found on this factor that it benefitted neither party. It was clear from the evidence that the market for office space was considerably less than ideal at the time of rezoning. Also, the trial court correctly noted evidence that, at the time of trial, there was a relatively high vacancy rate for commercial property. On the other hand, the trial court stated that there was "no credible testimony" at trial with regard to a need locally for additional residential units. Defendants claim the Village rezoned the property, in part, in response to the "very substantial demand" for the kind of residential development proposed by Gray. They do not, however, cite to the record to support this claim. Hence, we cannot say the trial court's determination regarding credible testimony favorable to defendants was against the manifest weight of the evidence. This factor does not help either party.

■ To summarize, while some of the factors are entitled to little if any weight, a number of them heavily favor the plaintiffs. These include the most significant factor of existing uses and zoning of nearby property. None of the factors favor defendants. When evi-

dence on all the factors is put together and studied as a whole, it becomes apparent that the trial court could have found, by clear and convincing evidence, that the challenged ordinance was arbitrary, and without substantial relation to the public health, safety, or general welfare. Accordingly, plaintiffs overcame the presumption of validity enjoyed by a zoning ordinance, and the trial court correctly held the rezoning unconstitutional.

We turn now to plaintiffs' cross-appeal from the trial court's unfavorable rulings on the remaining counts of their complaint. Plaintiffs first charge that Westmont did not act in accordance with its own zoning ordinance. Specifically, they cite section 7.06 of the ordinance (Westmont, Ill., Zoning Ordinance § 7.06 (1979) (as amended)), which created and addresses the B-3 special development district. Sections 7.06 (K)(1) and (3) provide in pertinent part:

"(K) Termination of Preliminary Concept Plan and Final Concept Plan(s):

(1) Once an area has been included within a preliminary concept plan or final concept plan(s), and such plans have been approved by the village board, no other development may take place in such area nor may any other use thereof be made except in accordance with a village board approved amendment thereto, unless the plans are terminated as provided herein.

\*\*\*

(3) No approved plan shall be terminated after development commences except with the approval of the village board and of all parties with an interest in the land."

Westmont does not dispute that it neither approved an amendment to the preliminary concept plan nor secured plaintiffs' consent prior to changing the zoning and use of the subject site. Plaintiffs claim to have an interest in the land, as called for by the ordinance, by virtue of the fact that the hotel and golf course were developed as integral parts of the B-3 district, which included the subject site. According to plaintiffs, the Village acted contrary to its own ordinance when it unilaterally changed the use of the site, and the rezoning, therefore, was invalid. In essence, plaintiffs' argument is that, because of the relevant B-3 provision, the Village's power to rezone a parcel of land adjacent to plaintiffs' property is dependent upon plaintiffs' approval. There is no merit to this contention.

■ The trial court held, correctly we believe, that enforcement of the approval provision in the ordinance would result in an unconstitutional delegation of the zoning power to parties without any legal interest in the subject site. Zoning ordinances are enacted under legislative authority to provide for the public health, safety, and

welfare, and the adoption of a rezoning ordinance is a legislative act. (*Brodner v. City of Elgin* (1981), 96 Ill. App. 3d 224, 226-27; *Anthony v. City of Kewanee* (1967), 79 Ill. App. 2d 243, 247.) Legislative power may not be delegated to private individuals. (*People ex rel. Chicago Dryer Co. v. City of Chicago* (1952), 413 Ill. 315, 320; *City of Springfield v. Carter* (1989), 184 Ill. App. 3d 1, 17-18; *Brodner*, 96 Ill. App. 3d at 227.) In *Brodner*, a case invoked by the trial court, the zoning ordinance appeared to require that the written consent of the owner or his authorized representative accompany "all applications" for rezoning. Of this requirement we said that it constituted an unlawful delegation of the city's zoning power since it conferred upon the property owner absolute discretion to decide that no rezoning should ever occur. As the requirement was stated, it did not matter that the city might be executing a comprehensive plan for the common good. Under the ordinance provision an owner could selfishly and arbitrarily frustrate the plan.

While, as La Salle points out, in *Brodner* we declined to interpret the provision to require the owner's consent, and our comments, therefore, did not constitute the holding of the case, those comments are nonetheless accurate and applicable to any zoning ordinance which gives zoning power to a private party. In *Chicago Dryer* the supreme court struck down a statute that required the consent of 60% of the abutting property owners of a street before the street's name could be changed. It had previously been decided that changing the name of a street was a legislative act. The court concluded that the consent requirement impermissibly gave the property owners discretion to determine what the law should be. Observing that the provision affects the enactment of the law rather than its execution, the *Chicago Dryer* court stated:

> "[T]he decision of a group of property owners, in an admittedly legislative field, is made to prevail over that of the corporate authorities who represent the entire population. The will of this group is thrust upon the minority of the abutting owners and the city at large without regard for the necessity, beneficence or reasonableness of their action. This is legislative delegation in its most obnoxious form, for it is not even a delegation to an official or official body, presumptively disinterested, but to private persons whose interests may be, and often are, adverse to the interest of others similarly situated or directly affected by the exercise of the power delegated." (*Chicago Dryer*, 413 Ill. at 323.)

Despite La Salle's attempts to discredit *Brodner*, the trial court's reliance on the case was well placed.

Plaintiffs urge that the consent provisions involved here did not

delegate authority, but recognized rights retained by the property owners to insure development of the entire site on a cooperative and unified basis. They argue that, in a rezoning to B-3, the initial owners voluntarily give certain controls to, and simultaneously restrict, future owners. While we recognize plaintiffs' objective of maintaining the integrity of their original, cooperative, and unified site plan, we do not agree that it can be achieved through a municipal zoning ordinance, particularly since, as plaintiffs acknowledge, there are other mechanisms available.

When multiple owners submit their property to a cooperative planning process, and ultimately to rezoning, among themselves they can retain all the rights allowed by law, and impose on future owners all the legally permissible restrictions they choose, through, for example, restrictive covenants. Plaintiffs admit that they did, in fact, use certain of such covenants in their agreements. What the owners may not do is permanently interfere with a municipality's power to zone, or rezone, as it sees fit. Municipalities should not be prevented from making appropriate changes to a portion of a unified development plan merely because other owners who participated in the plan do not want any changes.

No matter how plaintiffs attempt to characterize what occurred here, a delegation of zoning power by any other name is still a delegation of zoning power, and we perceive the consent requirement in the Westmont ordinance to be just such a delegation. Hence, the requirement is invalid, particularly since the claimant of the delegated power has no legal interest in the site to be rezoned. We agree with the trial court that the language of *Brodner*, which applied to consent from an owner, is even more compelling here where the right to consent is sought by a neighboring property owner.

Any conclusion other than the one we reach would empower a property owner to indefinitely prevent rezoning and development of neighboring land. That plaintiffs could have imposed the restrictions they seek through private covenants does not render the consent requirement any more acceptable, as plaintiffs suggest. What plaintiffs could have done is irrelevant. They chose to attempt to maintain the zoning they prefer through manipulation of the zoning power. The trial court did not err in holding that the consent provision of section K-3 was unconstitutional and gave plaintiffs no power to prevent the rezoning of the subject site.

Plaintiffs next challenge the rezoning on grounds of equitable estoppel and vested rights. While the doctrine of equitable estoppel is applicable to municipal corporations (*Kenny Construction Co. v. Metropolitan Sanitary District* (1971), 52 Ill. 2d 187, 197; *Tim Thompson,*

*Inc. v. Village of Hinsdale* (1993), 247 Ill. App. 3d 863, 878), its use against a public body is not favored (*Burnidge Brothers Almora Heights, Inc. v. Wiese* (1986), 142 Ill. App. 3d 486, 495). Where it is invoked against a governmental entity exercising its governmental functions, estoppel will lie only in extraordinary or compelling circumstances. (*Thompson*, 247 Ill. App. 3d at 878; *Board of Trustees of the Addison Fire Protection District No. 1 Pension Fund v. Stamp* (1993), 241 Ill. App. 3d 873, 879.) The party claiming estoppel against a municipal corporation must demonstrate that (1) an affirmative legislative act of the municipality induced justifiable reliance on the part of the claimant, (2) the claimant acted on the basis of that reliance, and (3) the claimant substantially changed its position as a result of its reliance. *Thompson*, 247 Ill. App. 3d 878-79; *Haeflinger v. City of Wood Dale* (1984), 129 Ill. App. 3d 674, 677.

The requirements for successfully asserting the doctrine of vested rights are similar to those recited for equitable estoppel. As a general rule there is no vested right in the continuation of a zoning ordinance. (*County of Kendall v. Aurora National Bank Trust No. 1107* (1991), 219 Ill. App. 3d 841, 848; *Thompson v. Cook County Zoning Board of Appeals* (1981), 96 Ill. App. 3d 561, 577.) It is true that a party may acquire such a right where it substantially changes its position in good-faith reliance on the prior classification and the probability that it will be allowed to proceed with planned development. See *Thompson*, 247 Ill. App. 3d at 875-76; *Industrial National Mortgage Co. v. City of Chicago* (1981), 95 Ill. App. 3d 666, 670-71.

Plaintiffs submit that (1) Westmont took the affirmative action of creating a special zoning district with unique provisions designed to assure initial investors that, absent their consent, the plan would not be terminated before it could realize its potential; (2) it was precisely these assurances which induced them to invest in the plan; and (3) in reliance on the assurances from the Village, they expended $49 million to develop the hotel and golf course. Plaintiffs' argument is not persuasive.

Initially, plaintiffs acknowledge that there is no precedent on point for the relief they seek. The authorities they cite are similar to this case in that, in each instance, a municipality attempted to rezone property after the plaintiffs had invested substantial sums and resources in reliance on the original zoning. (See *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510; *Constantine v. Village of Glen Ellyn* (1991), 217 Ill. App. 3d 4; *Village of Palatine v. La Salle National Bank* (1983), 112 Ill. App. 3d 885; *Industrial*, 95 Ill. App. 3d 666.) However, in all of these cases estoppel and vested rights were claimed by plaintiffs who *owned* the property affected by the

attempted rezoning. Westmont rezoned only the site which is owned entirely by Gray; it did nothing to alter the zoning of plaintiffs' property. Plaintiffs nevertheless cite the owner-rezoning cases for the principle that Illinois courts have applied the doctrines of estoppel and vested rights to the law of land use "as necessary to protect the investments and expectations of innocent parties." Phrased in terms of estoppel and vested rights, plaintiffs ask us to extend the benefits of the two doctrines to them on the basis that they reasonably relied on the prior zoning, not of their own property, but of property adjacent to theirs, in making an investment in their own property. Under the circumstances of this case we need not consider the propriety of expanding the scope of applicability of these two venerable equitable remedies.

■ There is no doubt that Westmont adopted an ordinance which purported to give plaintiffs consent rights concerning changes made by the Village to the unified plan. But plaintiffs' own words belie their claim that it was the assurances in the ordinance which induced them to enter into the plan. Plaintiffs state in their brief that if the assurances made by Westmont had not been included within the B-3 regulation, "either Carsons would not have invested in the project or the deal would have been restructured to address these issues in private agreements." It seems clear to us that, while the consent provisions in the ordinance may have been very appealing, they were not crucial to plaintiffs' decision to invest since plaintiffs obviously knew they had other means of securing the assurances they sought. In fact, plaintiffs assert they *would* have used private agreements if the approval language had not been included in the ordinance. Thus, again, it seems to us that plaintiffs are saying they would have entered into the plan, with or without assurances from Westmont, because there were other compelling reasons to do so, and the assurances could be worked out without Westmont's participation. Altogether, the record does not reflect the kind of reliance necessary to successfully invoke equitable estoppel or vested rights. Consequently, even if plaintiffs were in a position to benefit from either of the doctrines, they could not do so on the facts before us.

While plaintiffs stress that they relied on the continuation of B-3 zoning for the entire 144 acres, they knew from the start that the 16.9-acre subject site was held separately from their property. There was nothing in the facts or the law to lead them to believe that they could control the zoning on someone else's land. Plaintiffs were aware they could protect themselves from zoning changes on adjacent property through the use of private agreements. They evidently chose not to do so and may not now secure the zoning they seek by invoking equitable estoppel and vested rights. Those doctrines are not applicable.

The final issue raised by plaintiffs in their cross-appeal pertains to the Easement Agreement originally put in place by Carsons and the estate. Among other things the Agreement included mutual easements to provide for and coordinate road access, streetlights, utilities, signage, construction activities, slopes and grades, and storm water management. Plaintiffs contend that, under the Agreement, the easement rights may not be used for residential development purposes. We disagree.

At the outset plaintiffs suggest that the trial court did not address this issue even though it was raised in the complaint. In its memorandum opinion the lower court framed the issue as whether easements of access are limited to office use. The court used similar language in both its discussion of the issue and its judgment order. Plaintiffs urge that the court's ruling begs the question of whether the easements can be used for residential development. However, when the language cited by plaintiffs is read in context, and the opinion is read in its entirety, it is apparent the trial court decided the issue, if not expressly, then by clear implication. We will review the lower court's disposition accordingly.

The trial court essentially ruled that use of the easements for residential development was not precluded by the Agreement. Plaintiffs posit that the court misinterpreted the Agreement. They say that language in the document which refers to the intent to develop the site with offices; the types of easements involved, which arose from the decision to develop a mix of commercial, rather than residential, uses; and the testimony of the people who negotiated the terms of the Agreement, all combined to show that the parties intended that residential development should be prohibited on the subject site and that the easements, therefore, should not be used for such development. In light of the Agreement itself, plaintiffs' argument is not persuasive.

We have examined the Easement Agreement and find it to be complex, very thorough, and remarkably detailed. The overall tone of the document could be said to reflect the contemplation of the parties at the time that offices would one day be built on the site and that the easements would be used for office development. What it does not show is an intent to indefinitely preclude use of the easements for residential development.

An unambiguous contract must be enforced as it is written. (*Abbott v. Amoco Oil Co.* (1993), 249 Ill. App. 3d 774, 785.) When an agreement is not ambiguous, the intention of the parties to the agreement must be determined from the instrument itself. (*Farm Credit Bank v. Whitlock* (1991), 144 Ill. 2d 440, 447.) The court will

not add another term about which an agreement is silent, and no word should be added to or taken from the agreement to change the plain meaning of the parties as expressed therein. (*American States Insurance Co. v. A.J. Maggio Co.* (1992), 229 Ill. App. 3d 422, 427.) Plaintiffs urge us to look at the nature of the easements and at extrinsic circumstances surrounding the making of the Agreement. We will look first to the four corners of the document itself.

The Agreement includes a section entitled "Covenants and Restrictions" which sets forth various limitations and procedures the parties agree to impose on the use of the site. The first of these expressly provides that the site may not be used and/or occupied for industrial purposes or for hotel or motel purposes. It is understandable that the hotel would feel most strongly that it did not wish to have these uses right next door, strong enough in fact, to make them the subject of a covenant in the Agreement. We find no such covenant regarding use of the site for residential purposes.

We acknowledge that the B-3 zoning allowed industrial and hotel/motel uses, while it did not allow residential uses, and that is why, according to plaintiffs, the agreement contains restrictions only on the former uses. Nevertheless, it seems that if, at the time the Agreement was made, the plaintiffs had felt as strongly about prohibiting residential use on the site as they expressed in their trial testimony, and as they now claim they did, they would have made it the subject of a covenant in their very comprehensive Easement Agreement. Both parties to the agreement were sophisticated in that they had long been involved in business and contractual transactions. Carsons, particularly, had experience in land development and land use activities very similar to those involved here. There is no doubt plaintiffs were aware that a covenant in their Agreement could effectively preclude use of the land for residential purposes. They claim, however, that they believed they could prevent residential development through use of the consent requirement found in the B-3 zoning regulations. Absent legal precedent, plaintiffs had no basis for believing residential use could be indefinitely precluded by the zoning ordinance.

While the Agreement unmistakably prohibits use of the easements for industrial and hotel/motel development, it is silent on the matter of the easements *vis-a-vis* residential development. Absent ambiguity regarding this issue in the agreement itself, there is no need for us to consider extrinsic circumstances, and we decline to add a term which the parties themselves did not see fit to include in the form of a covenant. The trial court did not misinterpret the Easement Agreement when it found that it did not prohibit use of the easements for residential development purposes.

For all of the reasons we have set forth, plaintiffs prevail as to the constitutional issue raised in defendants' appeal. Defendants prevail as to all issues raised by plaintiffs in their cross-appeal. Hence, in appeal No. 2—93—0804, the trial court is affirmed in all respects.

## APPEAL NO. 2—93—1107

Plaintiffs, as well as the background facts, in this appeal are the same as those in No. 2—93—0804. Defendants are Gray and Boulevard Bank. Plaintiffs appeal from two separate trial court orders. One order granted summary judgment to defendants on plaintiffs' claim for sums owed pursuant to the Easement Agreement. The other order dismissed plaintiffs' claims based on alleged lien rights. Plaintiffs once again contend the trial court misconstrued the Easement Agreement.

Although the hotel and golf course were to be developed before the office site, in their Easement Agreement the parties provided for the contemporaneous construction of improvements which would benefit the entire development, including the office site. The improvements included water mains, roads, storm sewers, sanitary sewers, streetlights, traffic lights, and landscaping. Under the Agreement, BC Venture was responsible for constructing all of the improvements, and the estate agreed to share in the costs in accordance with a designated cost-sharing formula. BC Venture agreed to advance the estate's share of the costs, and the estate was initially responsible only for quarterly interest payments on its share. The Agreement provided for reimbursement of principal as follows:

> "The principal sum of all costs advanced by the Hotel Owner on behalf of the Golf Course and Office Building Owner shall be due and payable, plus all accrued and unpaid interest, upon the date of commencement of construction *** of an office building on the Office Building Site, but in any event by July 1, 1990."

In addition to its provisions regarding improvements, the Agreement set forth a number of other covenants and restrictions. As to all the promises it contained, the Agreement stated:

> "(a) It is intended that the agreements and grants of each Owner *** shall be construed as covenants and not as conditions and that to the fullest extent legally possible all covenants shall run with the land ***.
>
> (b) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective grantees, successors in interest, assigns, tenants and personal representatives."

The document was duly recorded.

Plaintiffs constructed the improvements as set forth in the Agreement and opened the hotel. The estate subsequently gave a mortgage on the office site to Boulevard Bank. Construction of an office building never did commence and, according to the amended complaint, plaintiffs made a demand on the estate for payment of its share of the cost of the improvements around June 15, 1990, but received nothing. Shortly thereafter the estate defaulted on its mortgage loan, and Boulevard foreclosed on the property. In November 1992 Boulevard conveyed the parcel to Gray and took back a purchase-money mortgage. Plaintiffs' subsequent demands on Boulevard and Gray were of no avail. Plaintiffs then filed this action.

In count VII of their amended complaint plaintiffs alleged a claim against Boulevard and Gray, as successor owners of the office site, for breach of the contract to pay for the improvements. Defendants moved for summary judgment as to that count, contending that they were not liable for any payment as a matter of law. The motion was granted, and plaintiffs added counts VIII and IX to the complaint, seeking relief based on legal and equitable lien rights against the property. Defendants moved for dismissal of these counts, both for failure to state a cause of action and on the basis of *laches*. Again, the motion was granted, and plaintiffs appealed from the trial court's disposition of all three counts.

Plaintiffs first contend the trial court erred in granting summary judgment as to count VII. A motion for summary judgment should be granted where the pleadings, depositions, and affidavits reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 1992); *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 420-21.

In their motion defendants contended that they were entitled to judgment because they did not own the office site on July 1, 1990, when the obligation to pay first became due. Boulevard further emphasized that it did not currently own the property, either. The trial court interpreted the reimbursement provision, along with the covenant language of the Agreement, to mean that the covenant to pay for improvements ran with the land, but only up until July 1, 1990, the payment due date named within the Agreement. According to the court, when payment was not timely made, the covenant was breached and a cause of action accrued which could be asserted only against the party who owned the property at the time of the breach. Plaintiffs strongly argue that the court misinterpreted the reimbursement language, insisting that the covenant was intended to run with the land until the debt was paid and, therefore, could be enforced

against defendants. Defendants respond that the lower court reached the correct conclusion because the covenant for reimbursement did not run with the land.

Defendants rely on authority which establishes that covenants may either run with the land or may be personal in nature, meaning that they do not run with the land. (See *Gerling v. Lain* (1915), 269 Ill. 337, 340; *Parrish v. City of Carbondale* (1978), 61 Ill. App. 3d 500, 504.) The test whether a covenant runs with the land or is merely personal is whether the covenant concerns the land and the occupation or enjoyment of it, or is a collateral and personal covenant not immediately concerning the land. (*Atwood v. Chicago, Milwaukee & St. Paul Ry. Co.* (1924), 313 Ill. 59, 64; *Parrish*, 61 Ill. App. 3d at 504-05.) Only when a covenant relates to the land and the enjoyment of it, or the action to be done or allowed concerns the land, will the benefit or obligation of the covenant pass with the ownership. (*Atwood*, 313 Ill. at 64; *Parrish*, 61 Ill. App. 3d at 505.) Defendants argue that the agreement by the estate to reimburse the plaintiffs, in the form of a one-time payment, was a personal undertaking which does not relate to the current use and enjoyment of the land. They urge that whether or not the obligation is now paid does not affect the nature, quality, or value of the property. Defendants conclude that, as a matter of law, the promise to pay did not run with the land and they, therefore, cannot be liable for the reimbursement sought by plaintiffs. We do not agree.

For the most part, the cases cited by defendants involve deeds or leases, whereby an interest in land was conveyed, and the covenant accompanied the conveyance. Those cases speak of covenants concerning the thing granted or the enjoyment of the land or estate conveyed. In this case there was no conveyance. The agreement was between separate property owners and pertained to their respective sites. However, that does not mean the covenants did not relate to or concern the land or its enjoyment. We are hard pressed to say that the covenant to pay for improvements, improvements which would directly benefit the office site, did not pertain to or concern that site or its use or enjoyment. Defendants' attempt to isolate the promise to pay from the benefit derived from that promise is not persuasive. We think the promise to reimburse must be examined in the context in which it was made and as of the time it was made, rather than the present time and circumstances. Viewed in the proper context, the promise was most certainly related to the use of the land.

Our conclusion on this issue is well supported by *Roche v. Ullman* (1882), 104 Ill. 11, the case in which plaintiffs place their confidence. In *Roche* the covenants were made relative to a party

wall. The recorded agreement gave both of the property owners the right to use the wall, but also provided that Ullman, who was to bear the cost of constructing the wall, was entitled to reimbursement upon the second party commencing use of the wall.

Ullman built the wall, half on his lot and half on Butler's lot. While Butler never commenced use of the wall, Douglas, a successor owner to Butler, did so, thereby making payment due. Douglas, who did not reimburse Ullman, lost his property through foreclosure to Roche. Ullman sought reimbursement from Roche, who, like defendants in this case, argued that the covenant did not run with the land. Roche stated the argument this way: "The covenant was not of a nature to run with the land. It being for the payment of money only, it may be performed anywhere, and its performance or non-performance can in no way affect the use or enjoyment of the land." (*Roche*, 104 Ill. at 16.) Roche also asserted that, even if the covenant did run with the land, it was breached when Douglas failed to pay and he, Roche, was therefore not liable. The trial court entered judgment against Roche personally for the value of the party wall and decreed that the plaintiff was entitled to a lien against Roche's property. Our supreme court affirmed.

In reaching its conclusion the *Roche* court had to resolve an issue which, while it is not altogether clear, appears to have been very similar to the one now before us. As we said earlier, many of the older cases arise in a context where an interest in land is conveyed. There was no such conveyance in *Roche*. The defendant in *Roche* claimed that the covenant to pay for half the cost of the wall did not bind an assignee "because there was created no privity of estate or tenure, which is essential." (*Roche*, 104 Ill. at 15.) The court responded to this argument as follows:

> "We concede the general doctrine, as contended for by appellant's counsel, that where the relation of landlord and tenant does not exist, only such covenants as are beneficial to the estate will run with the land, but we do not regard the doctrine as applicable to cases where adjacent proprietors have, as in the present case, so contracted as to create mutual easements upon each other's estates, and entered into covenants with respect to the same. The new relation thus created being of an intimate character, involving reciprocal duties with respect to each other's estates, may be regarded as an equivalent for the absence of tenure, so as to give effect to all covenants without regard to whether they are beneficial or onerous." (*Roche*, 104 Ill. at 20.)

Hence, the *Roche* court seemed to acknowledge that the covenant to reimburse Ullman was not the usual covenant that runs with the

land. It nevertheless found that, under the unique circumstances of the case, the covenant should do so. While the facts of this case are not identical to those of *Roche*, we think they are sufficiently similar to bring about the same result.

By their agreement, BC Venture and the estate certainly created mutual easements on each other's property. They also entered into covenants with regard to various aspects of their mutual undertaking which involved reciprocal duties with respect to each other's estates. We note specifically that the particular covenant at issue here, to a significant extent, provided for the sharing of the cost of improvements to be constructed in the easements granted elsewhere in the agreement. Under *Roche*, the covenant to reimburse in this case is the kind of covenant which, as a matter of law, may run with the land.

The trial court correctly found that the covenant did, indeed, run with the land. The intent of the parties in this regard is evident from both the provisions quoted above and the following provision:

> "[T]he acceptance of a conveyance of the Golf Course Site or Office Building Site or any part or parts thereof shall be deemed to be an acceptance of the benefits and burdens of the easements, licenses, covenants and restrictions created herein."

We note that the agreement in *Roche* contained the following language, which is similar to the language in the Easement Agreement as to the nature of the covenants:

> " 'It is also further agreed, that all the covenants and agreements herein contained shall be binding upon each party, their heirs, executors, administrators and assigns, and grantees of the said parties of the first and second part, and shall be so construed as to run with the land.' " (*Roche*, 104 Ill. at 18-19.)

Of this provision the *Roche* court said "nothing can be clearer than it was [the] intention" of the parties to impose the burdens as well as the benefits of the agreement upon their assignees. (*Roche*, 104 Ill. at 18.) Pursuant to *Roche*, the trial court in this case accurately determined that the covenant ran with the land. However, we believe the trial court erred in finding that the covenant was breached, and no longer ran with the land, because payment was not made by July 1, 1990.

The Agreement states that payment shall be due on the date of commencement of construction of an office building, "but in any event by July 1, 1990." Defendants argue that on the specified date reimbursement became a personal debt of the estate, which owned the site at the time, and that plaintiffs should have initiated a lawsuit to collect from the estate. However, as we read this language the

Agreement merely set forth a specific date as an alternative payment due date, in the event construction of the office building had not yet begun. Just as in *Roche*, where payment was due when the second party to the contract started using the party wall, the reimbursement requirement in this case was activated either upon the start of construction of an office building or July 1, 1990. In essence, rather than tolling the running of the covenant, as found by the trial court, the date certain merely triggered the running of the time for payment of reimbursement. Since payment has not been made, as called for by the covenant, it remains due and payable.

The *Roche* court, evidently aware that it was unusual to pass on to subsequent owners a debt such as the one involved here, stated:

"[Roche], having bought with constructive, and doubtless actual, notice of [the parties' intent to have the covenant run with the land], must be presumed to have intentionally assumed the burdens as well as the benefits of the agreement. The duty of paying for one-half the wall being a continuing liability resting upon the owner of the lot in his character of owner, and this not having been paid at the time of appellant's purchase, it is to be presumed that in becoming a purchaser, and thus assuming the relation of owner himself, he paid less for the property by the amount of the incumbrance than he otherwise would have done. Such being the case, it would now be highly inequitable to permit him to enjoy the benefit of the wall without reimbursing Ullman for one-half its cost." (*Roche*, 104 Ill. at 19.)

We believe the thoughts expressed by the *Roche* court are fully applicable here. The facts of this case, like the facts in *Roche*, are unique and require a response which takes into account all of the pertinent legal and equitable considerations. The *Roche* court's remarks are highly persuasive that the burdens of the Easement Agreement in this case run with the land every bit as fully as do the benefits.

Defendants' attempt to distinguish *Roche* is not persuasive. It is true the suit in *Roche* was brought against Douglas, the successor-owner who actually began using the party wall, and that Roche, in order to avoid delay in completing the building begun by Douglas, posted a bond to protect the plaintiff, Ullman. Nevertheless, the *Roche* court made very clear that, under the circumstances of the case, the covenant ran with the land and, therefore, a successor-owner was liable. We think this finding is the key here, not, as defendants suggest, the fact that the current owner stepped into the suit brought against the party who failed to pay when due. *Roche*, after all, fully defended against the reimbursement obligation. Our confidence in *Roche* is secure.

In order fully to resolve this issue, we must address the question of whether both Boulevard and Gray remain liable for reimbursement or whether the obligation now rests solely on Gray. We have already decided the covenant runs with the land. Since the benefits of such a covenant flow to the owner of the land, so also must the burdens. Boulevard assumed both the benefits and the burdens when it took title to the property, and then passed both along when it conveyed title to Gray. At oral argument, counsel for plaintiffs contended that Boulevard should be liable because it benefitted by being able to sell improved, rather than less valuable, unimproved land. However, this argument cuts both ways. As the *Roche* court pointed out regarding the defendant-purchaser in that case, defendant Gray in this case, who purchased from Boulevard with notice of the obligation (since the Easement Agreement was recorded), presumably paid less for the land because of the obligation imposed by the Agreement. Counsel could provide no other rationale for holding Boulevard liable. Neither can we. Accordingly, we conclude that Boulevard was entitled to summary judgment on this issue as a matter of law, but the trial court's order must be reversed as to Gray and the matter must be remanded for appropriate further proceedings.

Finally, plaintiffs submit that the trial court erred in dismissing their lien claims. In counts VIII and IX respectively, plaintiffs asserted the existence of a legal and an equitable lien on the property now owned by Gray, rising out of the Easement Agreement. In finding that plaintiffs enjoyed no lien rights in the land, the lower court specifically mentioned that the Agreement itself contained no express language creating a lien. The court further stated that equitable lien rights, if they ever existed, had expired on July 1, 1990, the date payment became due under the Agreement.

A lien can be created by statute or by express language in an agreement. (*Streams Sports Club, Ltd. v. Richmond* (1982), 109 Ill. App. 3d 689, 692; *Kunde v. Biddle* (1976), 41 Ill. App. 3d 223, 225.) It is not contested that the Easement Agreement did not include express lien language. However, even in the absence of express language, if an agreement sufficiently manifests that specific property is intended to serve as security for a debt, then an equitable lien may be imposed on the property so identified. (*Streams Sports Club*, 109 Ill. App. 3d at 692; *Bankers Trust Co. v. Chicago Title & Trust Co.* (1980), 89 Ill. App. 3d 1014, 1017-18.) In *Freer v. Hysan Corp.* (1985), 108 Ill. 2d 421, 427, a case invoked by defendants, the court stated that "[a] lien cannot be created by the court without an underlying explicit or implicit agreement between the parties or some fixed rule of law usually found in the statute." The *Freer* court's reference to an implicit

agreement clearly indicates that express lien language need not be used. Where the agreement does not expressly create a lien, the intent of the parties is controlling, and that intent must be gleaned from the document and the circumstances at the time the agreement is made. *Hibernian Banking Association v. Davis* (1920), 295 Ill. 537, 544.

▉ The Easement Agreement contains a covenant which runs with the land and imposes an obligation to pay the costs of improvements which relate to and benefit and enrich the land. We note the language, quoted above, providing that acceptance of a conveyance of the golf course or the subject site would be deemed "an acceptance of the benefits and burdens of the easements, licenses, covenants and restrictions created herein." It is reasonable to conclude from such language that the parties intended that the covenant to pay should be enforceable by means of a lien on the land. Also, as we already discussed, the covenant did not expire on July 1, 1990, as found by the trial court. Consequently, neither did the lien.

The *Roche* court did not explain its basis for affirming the imposition of a lien to insure payment of the obligation involved in that case. But we suspect that, in addition to the equities it discussed, the court relied on the same consideration we rely on here, *i.e.*, the intent of the parties as gathered from their creation of a covenant running with the land. We conclude that the trial court incorrectly found that plaintiffs had no lien rights. Since plaintiffs did acquire such rights through the Easement Agreement, the trial court order dismissing their lien claims must be reversed and the matter must be remanded for further proceedings.

## APPEAL NO. 2—93—1070

In this final matter Boulevard Bank appeals from the order dismissing its counterclaim. On September 26, 1991, Boulevard took title to the subject site pursuant to foreclosure on its mortgage. Thus, the bank owned the property when the plaintiffs filed their complaint in May 1992. The following August Boulevard filed a counterclaim seeking a declaratory judgment that the 1992 rezoning was valid. In November 1992 the sale of the office site to Gray was closed, with Boulevard taking back a purchase money mortgage.

In March 1993, plaintiffs moved for leave to withdraw their answer and substitute a motion to dismiss Boulevard Bank's counterclaim on the ground of lack of standing since the bank no longer owned the site. Plaintiffs offered to voluntarily dismiss the bank as a defendant on counts I through VI of their complaint if an order dismissing the counterclaim was entered. Following argument, the

trial court noted that the bank's conveyance of the property made the counterclaim moot because the bank's remaining interest was merely contingent and therefore not sufficient to give it standing. Consequently, the court granted plaintiffs' motion and dismissed Boulevard's counterclaim. Counts I through VI of the complaint were also dismissed as to Boulevard Bank. The rezoning issue was then tried without Boulevard's participation. Boulevard appeals from the order dismissing its counterclaim and requests that the matter be remanded for a trial.

Boulevard contends that it has standing because it has a real interest in this controversy and will be adversely affected by an outcome unfavorable to Gray. The interest asserted by the bank is a substantial financial stake in the success of Gray's development, due to the mortgage it holds on Gray's property. It claims it will be adversely affected since the Gray development, which is allowed under the challenged residential zoning, would enhance the value of the vacant site which serves as security for the mortgage. If the zoning reverts to office use, according to the bank's argument, its security will be impaired since offices are not likely to be built there, and the land will remain vacant. We do not believe it is necessary to resolve this standing issue.

Even if we assume that Boulevard has standing—and we stress that we do not so decide—the trial court's decision to the contrary amounted to harmless error since there is no indication that the bank was prejudiced as a result of being dismissed prior to trial. Boulevard asserts that it has been prejudiced, but the only prejudice it refers to is the allegedly negative effect of the trial court's decision on the value of Boulevard's security interest. Surely, such an attack on an adverse decision is common to every losing party following every trial. Boulevard's argument is misdirected. The real issue here is not whether the bank was injured by the trial court's decision, but whether the bank's participation would likely have changed the trial court's decision, at least with regard to the bank's interests. Based on the record, we do not think so.

To begin, there is no dispute that Boulevard Bank owned the office site at the time plaintiffs filed their complaint. Thus, Boulevard was a named defendant from the outset. The record reflects that, thereafter, the bank participated fully in all pretrial aspects of the case, including pleading, discovery, and motions. Boulevard even filed a disclosure of experts and expert testimony to be offered at trial, pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220). The bank remained fully involved in this case right up to the eve of trial. Counts I through VI of the complaint, all of which alleged the inva-

lidity of the rezoning, were not dismissed as to Boulevard Bank until April 14, 1993. Trial on the rezoning issues began on May 3, 1993.

While Boulevard did not actually participate in the trial, its presence was clearly felt. Prior to trial Boulevard asserted basically the same defenses as those asserted by Gray and the Village. These defenses were raised at trial. We particularly observe also that, as plaintiffs correctly point out, several of the expert witnesses who had been disclosed by Boulevard before the trial did, in fact, testify as witnesses for Gray, despite plaintiffs' objections. To an appreciable extent, then, the case begun by Boulevard was merely continued at trial by the other defendants.

Moreover, we believe that Gray was in a position to effectively delineate and safeguard Boulevard's interests. By the time the trial actually began, Gray owned the office site and Boulevard had a security interest in it, in the form of a mortgage. In our opinion these respective interests, while not identical, are very similar in that both the owner and the mortgagee would logically be greatly concerned about the value of the property. We agree with plaintiffs that the interests of Gray and the bank are directly aligned. This community of interest is reflected in the mortgage documents, which expressly prohibit Gray from initiating or acquiescing in any change in zoning or use of the property without the bank's prior written consent. We conclude that the nature of their respective concerns was sufficiently similar that Gray could adequately present and protect the interests of Boulevard Bank at the trial itself.

As for the conduct of the trial, we have examined the report of proceedings and find that Gray and the Village defended the rezoning in a competent and vigorous manner. They fully utilized cross-examination, presented expert witnesses, and developed their own positions through abundant testimony and exhibits. Boulevard nowhere shows us that the trial defense was inadequate or in any way lacking or, for that matter, that it would have done anything differently had it been a participant. All in all, it is difficult to see what Boulevard might have done that the remaining defendants did not do.

Another factor to be considered is the substance of the counterclaim which was dismissed. In the counterclaim Boulevard set forth two counts pertinent to the rezoning. The first of these counts alleged that the rezoning conformed to procedural requirements, an allegation essentially reflecting the claims made in the first two counts of plaintiffs' complaint. Boulevard contended that, to the extent Westmont's ordinance required plaintiffs' consent to rezoning, it amounted to an unconstitutional delegation of zoning power. As shown above, this issue was thoroughly litigated and determined by the trial court.

Boulevard's second count alleged that the rezoning to residential use promoted the health, safety, and general welfare of the public. This claim mirrored plaintiffs' count III allegation that the rezoning was arbitrary and capricious, another issue which was exhaustively examined at trial. Hence, it is plainly evident that the rezoning issues raised by Boulevard's counterclaim were raised, fully litigated, and decided at trial. Boulevard does not show otherwise and does not demonstrate what more it would have done regarding these issues had it been allowed to proceed to trial.

We find curious, also, certain of Boulevard's conduct relative to this action if, indeed, it felt as strongly about participating in the trial proceedings as it now claims. After its counterclaim was dismissed, and up until the time this appeal was filed, Boulevard made no attempt whatsoever to participate further in the adjudication of plaintiffs' action. Boulevard did not object to also being dismissed as a defendant in plaintiffs' action. On the contrary, the report of proceedings reflects only a concern by counsel that, if Boulevard's counterclaim was dismissed, then the relevant counts of the complaint should also be dismissed. Boulevard did not ask for leave to file an amended counterclaim or even ask the trial court to reconsider its decision. Neither did it request a stay of trial so it could file an interlocutory appeal or seek to intervene in plaintiffs' action on the ground that its rights could not be adequately protected by Gray or the Village. It appears that, at the time, Boulevard was perhaps content to allow Gray and the Village to defend the rezoning. At the very least, the bank was not so concerned about protection of its interest in the office site that it did all it could to remain active in plaintiffs' action to overturn the Village's rezoning of the site. In fact, after its counterclaim was dismissed, Boulevard did nothing to assert the urgency of its continued participation.

Even in its arguments on appeal, Boulevard does not make clear how it was prejudiced by not taking part in the trial. As we discussed, to a large extent the bank recites only the negative effects of the trial court's decision. When it does address the effects of its absence from the trial, it does so in the form of unsupported allegations. In a reply to one of plaintiffs' arguments, Boulevard urges that *res judicata* does not bar further proceedings on its counterclaim because it did not have an opportunity "to present all pertinent facts" since it could not participate in the trial. However, Boulevard does not even suggest what those facts that were not presented might be or how they could be significant to the trial result. Boulevard's allegation does not demonstrate any prejudice to itself.

In summary, Boulevard cannot claim it made every effort to remain an active participant in the trial. Furthermore, Boulevard

has not shown that its interests were prejudiced as a result of not participating in the trial of the rezoning issues. The record, on the other hand, is persuasive that Boulevard's interests were not only represented, but also staunchly defended through the course of a hard-fought trial. Absent prejudice, the trial court's ruling on Boulevard's standing to bring its counterclaim, if erroneous at all, was harmless and does not warrant a remand for trial.

For all the reasons stated above, in the Gray/Westmont appeal, No. 2—93—0804, the judgment of the circuit court of Du Page County, which declared the rezoning unconstitutional, is affirmed in all respects. In plaintiff's appeal, No. 2—93—1107: (1) the order of April 14, 1993, which granted summary judgment to defendants on the issue of reimbursement due to plaintiffs, is reversed, (2) the order of August 31, 1993, which dismissed plaintiffs' lien claims, is likewise reversed, and (3) the matter is remanded to the circuit court for further proceedings. In Boulevard Bank's appeal, No. 2—93—1070, the order of the circuit court which dismissed the bank's counterclaim is affirmed.

No. 2—93—0804, Affirmed.
No. 2—93—1107, Reversed and remanded.
No. 2—93—1070, Affirmed.

INGLIS, P.J., and DOYLE, J., concur.