BERKELEY PROPERTIES, INC., Plaintiff-Appellant, v. BALCOR PENSION INVESTORS II *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—0483

Opinion filed January 31, 1992.—Rehearing denied April 22, 1992.— Modified opinion filed April 24, 1992.

Harvey J. Barnett, of Barnett, Bornstein & Blazer, Ltd., of Chicago, for appellant.

Raymond E. Stachnick and Cynthia Photos Abbott, both of Katten, Muchin & Zavis, of Chicago, for appellees.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Berkeley Properties, Inc. (Berkeley), appeals from an order denying its motion for summary judgment and granting the cross-motion for summary judgment in favor of the defendants, Balcor Pension Investors II (Balcor) and Balcor Mortgage Advisors, Inc. The sole issue is whether the trial judge correctly interpreted the language of an agreement between the parties.

On December 29, 1982, Balcor loaned $5,400,000 to Interstate Plaza Associates, Ltd. (Interstate), for the purpose of constructing an office building known as Interstate Plaza Office Building (Property I) in Boca Raton, Florida. Balcor and Interstate executed a secured promissory note (the Balcor Note) for $5,400,000. The Balcor Note, which was executed in Florida, was a "wrap-around" note, in that the amount included the principal balance of $3,050,000 due on an underlying note and first mortgage in favor of Northwestern Mutual Life (Northwestern), which covered property known as Interstate Plaza II (Property II). Property II was adjacent to Property I and was owned

by an entity separate from Interstate. The Balcor Note was secured by a wrap-around mortgage, made by Interstate and Scotia Interstate, Inc. (Scotia), in favor of Balcor, encumbering Property I. (For explanation of wrap-around mortgages, see generally Notes, *Unwrapping the Wraparound Mortgage Foreclosure Process*, 1990 Wash. & Lee L. Rev. 1025; Note, *Wrap-Around Financing: A Technique for Skirting the Usury Laws*, 1972 Duke L.J. 785.) Scotia was the ground lessor of Property I. The parties have treated both Scotia and Interstate as the owners of Property I. They will be identified as "the Holders."

The Balcor Note was nonrecourse, that is, it specifically provided that the Holders would "not be personally liable by reason of any default in the payment of this Note." The Note further provided that Balcor agreed "to look solely to the Mortgaged Property [Property I] *** for the payment of any amount due under this Note."

The Northwestern Note was an amortizing note with monthly payments allocated to the reduction of principal and payment of interest. The Balcor Note was a nonamortizing note with monthly payments allocated to interest only. The fixed monthly payments by the Holders to Balcor included the principal and interest on the Northwestern Note and only the interest on the Balcor Note. Beginning on January 1, 1983, the interest payments were to be $50,062.50 per month; 35 months later they were to be $58,500 per month and three years after that they were to be $62,250 per month until the note was paid. The entire amount of principal was due on September 1, 1994. Balcor did not become liable on the note, and the Holders were not relieved of liability. Thus, Balcor's role *vis-a-vis* Northwestern was that of a conduit in that Balcor would pay Northwestern from the interest payments it received from the Holders.

Contemporaneous with the execution of the Balcor Note and mortgage, the parties entered into an "Agreement Regarding Final Payment of Mortgage" (the Agreement). The Agreement recited that the Holders had represented to Balcor that at some date within three years after the Agreement was executed the Holders might elect to secure a release of the Northwestern mortgage. The Holders would be required to make a partial prepayment of the Northwestern Note, "which will not affect the monthly payments thereunder." The Agreement further provided as follows:

> "Balcor hereby acknowledges that it is not to benefit by the Prepayment, and the parties hereto wish to provide for the return of said Prepayment to Holders upon the maturity of the Balcor Loan.

* * *

> Balcor hereby acknowledges that upon the final payment of principal and interest under the Balcor Note, the outstanding principal balance of the Underlying Notes [Northwestern Note] shall be deemed to be the amount ('Deemed Amount') which would have been the then-outstanding principal balance of the Underlying Notes had said Prepayment not been made (the difference between said Deemed Amount and the actual principal balance of the Underlying Notes is hereinafter referred to as the 'Equity'). Balcor hereby acknowledges that the Equity shall be the exclusive property of Holders, and that Balcor shall make no claim on account thereof."

Immediately following the closing on the Balcor Note, Interstate and Scotia sold Property I to Boca Interstate Associates, Ltd. (Boca), with Balcor's approval. At the same time Boca purchased Property II. On January 1, 1984, Boca made a partial prepayment of the Northwestern Note in the amount of $385,000. The effect of the prepayment is explained thus: Upon repayment of the $5.4 million of principal due on the Balcor Note, at maturity or any earlier date, Balcor would repay the principal balance then due Northwestern, retain an amount sufficient to recover the Balcor funds advanced ($2,353,000) at the time the loan was made by Balcor, and retain any remaining balance as its equity buildup as provided for by the terms of the Balcor Note. The prepayment resulted in an equity buildup retained by Balcor in an amount in excess of that which was agreed to under the terms of the Note. It is the right to that excess "equity" which is the subject of this lawsuit.

On September 1, 1986, the Holders defaulted on their obligation to make the monthly installments due Balcor. Balcor demanded that the Holders cure the default. When the Holders failed to cure the default, Balcor notified the Holders and Boca that all amounts owing under the note had been accelerated and were immediately due. According to the affidavit of Donald Price, a vice-president of Balcor, the principal balance due Northwestern before the prepayment was $2,819,914 and the principal balance after the prepayment and subsequent payments until the default was $2,289,284 representing a total equity of $530,630 which would have been available to the Holders under the Agreement (in the absence of a default, according to Balcor). The plaintiff maintains that the equity totals $630,000.

Balcor advised the parties that it would foreclose the lien of the wrap-around mortgage if the total indebtedness was not paid on or before November 3, 1986. On November 21, 1986, Boca transferred

its interest in the property to Scorpio Realty, Inc. (Scorpio), without the consent of Balcor as required by the wrap-around note and mortgage. Berkeley Realty Associates, Inc., and plaintiff, Berkeley Properties, Inc., each owned 50% of the shares of Scorpio. In turn, Lanny Horwitz and Carl Sax each owned 50% of the shares of Berkeley Realty Associates, Inc., and Berkeley Properties, Inc.

On December 17, 1986, Balcor filed a complaint to foreclose its mortgage in the circuit court of Palm Beach County, Florida. On January 23, 1987, Scorpio assigned any sums to which it was entitled under the Agreement to the plaintiff, Berkeley Properties, Inc.

Scorpio filed for bankruptcy, and that filing stayed the Florida foreclosure proceedings. On December 14, 1987, the bankruptcy court dismissed Scorpio's claim for relief with prejudice, finding that the case constituted a bad-faith filing.

On May 31, 1988, a final judgment of foreclosure was entered in the Florida proceedings. The judgment found that the sum of $7,637,255 was due Balcor on the wrap-around note and mortgage. Pursuant to the judgment order, a judicial sale of the property took place. Balcor was the sole bidder and acquired title to the property with a bid of $100. After the sale, $7,637,155 of the judgment remained unsatisfied. The foreclosure judgment order expressly provided that the court had not determined the rights of Berkeley under the Agreement and that the payment in satisfaction of the mortgage and the sums due Balcor from the proceeds of the sale would not affect the rights of Berkeley under the Agreement.

On February 7, 1990, Berkeley filed this complaint in the circuit court of Cook County seeking a declaratory judgment that Berkeley was entitled to receive the sum due to the Holders under the Agreement as a result of the prepayment. Berkeley's complaint asserted that "final payment" was made when the property was sold at the foreclosure sale. The complaint also alleged breach of contract, unjust enrichment, and breach of the obligation of good faith. The judge denied Berkeley's motion for summary judgment on the declaratory judgment count and entered summary judgment on behalf of Balcor.

Both sides agree that the issue in this case is whether the sale of the property to Balcor pursuant to the foreclosure judgment was a "final payment" as that term is used in the Agreement. In substance, the trial judge found that there had been no "final payment" because of the existence of a "deficiency." He held that a deficiency existed because the property had been sold for a sum insufficient to satisfy the obligation owed to Balcor.

■ Initially, Berkeley contends that Florida law applies in this case. However, Berkeley also contends it would prevail under either Florida or Illinois law. Balcor does not concede that Florida law applies, but Balcor asserts that Berkeley would not prevail under either Florida or Illinois law. The Balcor Note expressly provided that its validity and enforcement would be governed and controlled under Illinois law. The mortgage states that it shall be governed by the laws of Illinois, except the laws of Florida shall apply to "the creation, priority, perfection and maintenance of the lien of the security interest or to proceedings taken for the enforcement of the rights of the mortgagee [Balcor]." The Agreement is silent as to what law is applicable. When instruments are entered into simultaneously, they must be construed together. (See *Sandra Frocks, Inc. v. Ziff* (1947), 397 Ill. 497, 74 N.E.2d 699; see also *International Ship Repair & Marine Services, Inc. v. General Portland, Inc.* (Fla. App. 1985), 469 So. 2d 817.) We conclude, therefore, that the Note, mortgage and Agreement should be construed pursuant to Illinois law. We further conclude that there is no substantial difference between Florida and Illinois law insofar as the construction of the Agreement before us is concerned. Florida law governing foreclosure procedures is relevant and will be discussed later in this opinion.

Interpretation or construction of a contract is a matter of law, and an appellate court is not restricted in its right to reassess the meaning and effect of a written instrument. (*Zale Construction Co. v. Hoffman* (1986), 145 Ill. App. 3d 235, 494 N.E.2d 830; *Leseke v. Nutaro* (Fla. App. 1990), 567 So. 2d 949.) Neither party raises any question of fact, although Berkeley does argue that a question of fact would exist *if* this court determines that the existence of a theoretical "deficiency" precludes the plaintiff from receiving the Equity under the Agreement.

■ The defendant argues that there can be no final payment if a deficiency exists. The plaintiff answers that there is no deficiency because the note is a nonrecourse note. The defendant replies that there is a difference between a deficiency and a deficiency judgment and that the defendant's inability to receive a deficiency judgment does not mean that a deficiency cannot exist. The trial judge agreed with the defendant's distinction between deficiency and deficiency judgment, and, as an academic matter, so do we. A debt may be unenforceable because of the lapse of the statute of limitations, but the debt still exists. So also, a deficiency may exist, but a claim for the deficiency may not be enforceable. Our agreement with the defendant on this abstract point, however, is not dispositive of the ultimate is-

sue, which is the intent of the parties as evidenced by the language they used in the Agreement. In determining that intent, we will consider whether the record establishes a deficiency as a matter of law and how the existence of a deficiency is to be determined.

■ The primary object, purpose or consideration in construing a contract is to determine the intent of the parties. (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 443 N.E.2d 36.) A contract cannot be construed for the purpose of supplying an intention not otherwise shown. (*Chicago Land Clearance Comm'n v. Jones* (1957), 13 Ill. App. 2d 554, 142 N.E.2d 800.) The intention of the parties to a contract must be determined from the language employed in the contract. (*Western Illinois Oil Co. v. Thompson* (1962), 26 Ill. 2d 287, 186 N.E.2d 285.) To support a finding in favor of the defendant, therefore, we must construe the terms of the Agreement to be an expression of the intention of the plaintiff and the defendant that "final payment" was to depend on whether a deficiency existed. It is the defendant's position that the foreclosure proceedings themselves established the deficiency and the amount when it bid $100 for the purchase of property for which it loaned over $2 million a few years before. Therein lies a fatal flaw in the defendant's position. Florida law, which governed the foreclosure procedures followed in this case, provides that a separate hearing may be held to determine whether a deficiency exists and the amount of any deficiency. (*Flagship State Bank v. Drew Equipment Co.* (Fla. App. 1981), 392 So. 2d 609.) Even under Illinois law, confirmation of a judicial sale may be rejected if the difference between the amount bid and the foreclosure judgment is "unconscionable." (Ill. Rev. Stat. 1989, ch. 110, par. 15—1508.) Contrary to Balcor's argument, we judge that the purchase price is one of the "terms of sale" as that phrase is used in the statute. The point we wish to make is that the curtain does not fall when property is sold at foreclosure proceedings for less than the amount of the judgment. The law provides for avenues of relief which are available to the judgment debtor to contest the terms of the sale. For these reasons, we reject the defendant's argument that a deficiency was finally established as a matter of law by the foreclosure sale itself. That being so, the question arises: Where and how are the existence and amount of a deficiency to be determined?

The defendant concedes that under both Illinois law (*Bank of Benton v. Cogdill* (1983), 118 Ill. App. 3d 280, 454 N.E.2d 1120) and Florida law (*Heim v. Kirkland* (Fla. App. 1978), 356 So. 2d 850) it could not receive a deficiency judgment because of the nonrecourse nature of the note. It also concedes that under Florida law the pas-

sage of two years after foreclosure would bar it from seeking a deficiency, even if the note had been a recourse note. (*Financial Security Savings & Loan Association v. Espana River Partnership* (Fla. App. 1989), 537 So. 2d 683.) In addition, no Illinois court and no Florida court would entertain an action to determine the existence of a deficiency solely as an advisory device for the benefit of the parties. Consequently, when the parties entered into the Agreement, they are presumed to have known that a judicial sale for less than the foreclosure judgment would not necessarily establish a deficiency and that there was no forum which would decide that a deficiency existed in the absence of an actual controversy.

■ Contracts should receive a fair and reasonable construction. (*Tatar v. Maxon Construction Co.* (1973), 54 Ill. 2d 64, 294 N.E.2d 272.) It is not reasonable that the plaintiff intended to surrender its right to the Equity simply because Balcor might assert that a theoretical deficiency existed. Balcor argues that the result we reach here is unfair because it may have, *at this point*, lost a substantial amount of money. But the fairness argument cuts both ways. Let us assume that someone bid almost all of the amount of the judgment but still left a deficiency of $1,000. It would still be the position of Balcor that the plaintiff had no right to recover the $530,000 (or $630,000) equity because of a $1,000 deficiency. The unfairness of that result is obvious.[1] Moreover, " 'courts will not, because a more equitable result might be reached thereby, construe into a contract provisions that are not therein.' " (*Tatar v. Maxon Construction Co.*, 54 Ill. 2d at 67, quoting *Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.* (1946), 395 Ill. 429, 433, 70 N.E.2d 604.) We judge, therefore, that the parties did not intend that a judicial sale of the property for less than the judgment would bar Berkeley's right to the Equity.

■ We turn now to the language of the Agreement relied on by the plaintiff. The Note states that Balcor will look solely to the mortgaged property for the *"payment* of any amount due" under the Note or performance of any obligations under the Note. (Emphasis added.) In our judgment, "payment of any amount due" includes a "final payment." The Agreement provides that "Balcor acknowledges that it is not to benefit by the Prepayment, and the parties hereto wish to provide for the return of said Prepayment to Holders upon the *maturity* of the Balcor Loan." (Emphasis added.) "Maturity" is defined as

---

[1] Balcor also maintains that if it subsequently sells the property for an amount in excess of the judgment, it may retain the excess.

"[t]he date at which an obligation, such as the principal of a bond or a note, becomes due." (Black's Law Dictionary 883 (5th ed. 1979).) Upon the Holders' default, the entire obligation became due; thus, the loan reached maturity. The Agreement also provided that "Balcor hereby acknowledges that the Equity shall be the exclusive property of Holders, and that Balcor shall make *no claim* on account thereof." (Emphasis added.) In construing the Note and Agreement together, we judge that it was the intent of the parties that acceptance of the property after default would constitute "final payment," as that term is used in the Agreement.

The defendant cites, and the trial judge relied on, *Strause v. Dutch* (1911), 250 Ill. 326, 95 N.E. 286. We do not believe that *Strause v. Dutch* supports the defendant's position. The court there expressly pointed out that the only question before it was whether a mortgagee who had "*secured a deficiency decree* after the sale of the mortgaged property *** is such a decree creditor as is entitled, under the statute, to redeem the premises sold." (Emphasis added.) (250 Ill. at 330.) Apart from the fact that the issue in *Strause,* which involved a recourse note, was a narrow one not present here, there is the overriding fact that the case before us involves a nonrecourse provision; this is a fact that we cannot simply ignore. Similarly, the other case cited by the defendant, *Connelly v. Central States Southeast & Southwest Areas Pension Fund* (5th Cir. 1963), 315 F.2d 683, 684, does not support the defendant's position. *Connelly* also dealt with a recourse note which provided that there would be release of certain land "if the [m]ortgagors be not then in default." The note also stated that the mortgagors must "make payments on the [n]ote promptly as the same become due and payable." The mortgagor contended that upon the foreclosure of the property the land was released. The court held that the term "payment" was meant to be a voluntary payment, and not payment through a foreclosure. We emphasize that the case did not deal with a note which contained language that the mortgagee was to look to the property for "payment of any amount due."

The defendant also argues that summary judgment in its favor was proper because of other language in the Agreement and because the plaintiff allegedly has no standing to assert any right to the Equity.

Paragraph 3 of the Agreement states that the Holders "waive, and agree that they shall not be entitled to or assert" any rights with respect to the prepayment as against "Balcor's right to receive payment on account of all or any portion of the Balcor obligations." The paragraph further provides that the Holders acknowledge that any

rights they may have arising with respect to the prepayment shall at all times be subject and subordinate to the rights of Balcor under the Balcor Note. Balcor argues that by this paragraph the Holders agreed not to assert any of their rights arising from the prepayment against Balcor's right to receive payment under the Note.

It is presumed that parties do not insert meaningless words and phrases into contracts; therefore, no part of a contract should be rejected as meaningless or surplusage. (*In re Estate of Savage* (1979), 73 Ill. App. 3d 656, 392 N.E.2d 263.) Acceptance of Balcor's interpretation would render meaningless the language of the Note and the Agreement which we have quoted in support of the plaintiff's position. It is reasonable to conclude that the rights of the Holders were subordinate only to Balcor's right to accelerate, foreclose, and receive the property. We must, therefore, reject the defendant's argument that what was given to the plaintiff in the Note and paragraph 4 of the Agreement was taken away by paragraph 3 of the Agreement.

■ The last argument of the defendant that the plaintiff lacked standing to assert any right to the Equity was not considered by the trial judge. We recognize that an appellee may seek affirmance on any ground contained in the record, but, because we have concluded that this case must be remanded for resolution of other questions, we will refrain from passing on this argument.

The plaintiff asks that we enter summary judgment in its behalf. We conclude that we may not do so because of the still unresolved affirmative defenses raised by the defendant. The case, therefore, must be remanded for further proceedings to resolve those affirmative defenses as well as the other counts of the complaint. At the same time the court may consider and pass on the defendant's last claim that summary judgment was properly entered because of the plaintiff's alleged lack of standing.

The order granting summary judgment in favor of the defendant is reversed, and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

Judgment reversed and remanded.

RAKOWSKI and LaPORTA, JJ., concur.