S.A. HEALY COMPANY,
Plaintiff–Appellee,

v.

MILWAUKEE METROPOLITAN
SEWERAGE DISTRICT,
Defendant–Appellant.

No. 94–3038.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1995.

Decided March 23, 1995.

---

Jane C. Schlicht, Godfrey & Kahn, Milwaukee, WI, Vivian Katsantonis, Mark Sgarlata, Timothy Brown, Watt, Tieder & Hoffar, McLean, VA, for plaintiff-appellee.

Michael J. McCabe, Robert Crawford (argued), Milwaukee Metropolitan Sewerage Dist., Legal Services, Milwaukee, WI, for defendant-appellant.

Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.*

POSNER, Chief Judge.

 Milwaukee's sewage authority made a contract with the Healy company for the construction of a vertical shaft 300 feet deep and 13 feet in diameter to carry liquid wastes to storage and treatment facilities. The contract price was in excess of $8.8 million. The contract itself is 2,306 pages long—which demonstrates that detail alone cannot be counted on to prevent disputes. Healy encountered unexpected difficulties in the construction of the dropshaft as a result of a heavy flow of groundwater into the underground work site. These difficulties increased the cost of construction and led Healy to seek an adjustment in the contract price. When that was refused, Healy sued the sewage authority for breach of contract. A jury awarded Healy damages in excess of $1.5 million, inciting this appeal. Wisconsin law controls the substantive issues—though not for the reason given by the appellant, that "a federal court sitting in diversity must apply the substantive law of the forum state." As we tirelessly remind litigants, a federal court sitting in diversity must first apply the forum state's choice of law rules, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 915 (7th Cir.1994); *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir.1991), which may or may not select the forum state's substantive law to govern the dispute. No matter. The contract provides that the law of Wisconsin shall govern disputes arising under it, and Wisconsin enforces such choice-of-law agreements. *First Wisconsin National Bank v. Nicolaou*, 85 Wis.2d 393, 270 N.W.2d 582, 584 n. 1 (App.1978).

Inflow of groundwater was recognized from the beginning as a potentially serious impediment to the construction of the shaft. One way of controlling such inflow is by means of "consolidation grouting." Holes are drilled into the ground surrounding the site of the shaft. A mixture of cement and water is poured into the holes under pressure. The mixture seeps into the rock formations surrounding the site and seals gaps in them through which groundwater might flow into the shaft. The contract required the contractor, Healy, to perform consolidation grouting and to construct several pumping test wells, shallower and smaller-bored than the shaft itself, to determine the adequacy of the grouting. The contract recites that "after completion of grouting from the surface, the total quantity of groundwater pumped from each drop shaft pumping test well shall not exceed 25 gpm [gallons per minute].... [I]f the pumping tests do not meet the above criteria, additional grouting may be directed by the Engineer [hired by the sewage authority to monitor the contractor's performance] followed by additional pumping tests." Not until the engineer determined that the grouting was adequate could Healy begin excavating for the drop shaft. The expense of this pre-excavation grouting was to be borne by the sewage authority, rather than being folded into the overall contract price.

The pumping test wells were built, some grouting was done, and tests were conducted. The amount of groundwater exceeded 25 gpm in the tests, so the sewage authority's engineer directed Healy to do more grouting, which it did, at the sewage authority's expense. Additional tests were then conducted, and showed that the amount of groundwater had fallen to 19 gpm. The engineer therefore authorized Healy to begin excavating. Healy soon encountered inflows of groundwater that exceeded 25 gpm, and the excess groundwater slowed the project and increased Healy's costs. Healy asked the sewage authority for relief under the clause of the contract entitled "Differing Site Condition," which so far as relevant to this case

* Hon. Charles R. Norgle, Sr., U.S. District Judge for the Northern District of Illinois, sitting by designation.

entitles the contractor to a price adjustment on the basis of "subsurface or latent physical conditions at the site differing materially from those indicated in this Contract." (This is a standard clause in government construction contracts. See, e.g., *Iacobelli Construction, Inc. v. County of Monroe*, 32 F.3d 19, 23–24 (2d Cir.1994); *Granite–Groves v. Washington Metropolitan Area Transit Authority*, 845 F.2d 330, 332 n. 3 (D.C.Cir.1988); *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1580 (Fed.Cir.1987); *Youngdale & Sons Construction Co. v. United States*, 27 Fed.Cl. 516, 528 (1993).) Healy's position, which the jury accepted, is that the contract "indicated" 25 gpm to be the maximum inflow of groundwater that Healy should expect to encounter, so that anything significantly above that level would "differ materially" from the contractual indication and entitle Healy to the adjustment. Healy based this interpretation not only on the language of the contract but also on testimony as to what the parties had said in the negotiations that led up to the signing of the contract.

■ The sewage authority advances a number of grounds for reversal. The most fundamental is that the contract is unambiguous, so that its meaning should not have been submitted to the jury and extrinsic evidence should not have been admitted to illuminate that meaning. The contract, which contains the usual integration clause stating that it is the entire agreement between the parties, provides that the contractor "shall be solely responsible for all construction means, methods, techniques, and procedures." This means, argues the sewage authority, that if Healy encountered unexpected impediments to construction it bore the full responsibility for surmounting them except insofar as the "Differing Site Condition" clause might entitle it to relief. But the clause is inapplicable, the authority argues, because nowhere does the contract "indicate" that Healy should not expect to encounter more than 25 gpm of groundwater inflow. That number refers solely to the pumping test wells. Once the wells passed the 25 gpm groundwater test, Healy was obliged to go forward with the excavation and became responsible for coping at its own expense with any excess groundwater that it encountered.

This is a possible reading of the contract but it is not so inevitable as to justify withdrawing the issue of meaning from the jury or depriving the jury of testimony about what the negotiators thought. We do not understand the sewage authority to disagree with the proposition that inflows of groundwater can greatly increase the cost of excavating an underground shaft. Since it was a fixed-price contract, the contractor would naturally be anxious about the possibility of encountering unexpectedly large groundwater inflows during the course of construction; and since the construction was underground, the contractor could not determine the volume of groundwater by simple inspection before beginning to excavate. The provision on test wells suggests—no stronger word is possible—that the figure of 25 gpm represented the parties' estimate of the maximum flow of groundwater consistent with performance of the contract at the fixed contract price. If the tests revealed a higher flow, the sewage authority would be responsible for the cost of such additional grouting as might be required to reduce the flow beneath that level. Since the test wells were much shallower than the projected dropshaft itself, the parties could not be confident that grouting sufficient to reduce the groundwater inflow to the test wells below 25 gpm would be sufficient to reduce the inflow below that level throughout the length of the dropshaft. But here the differing site condition clause clicked in; if the inflow was unexpectedly heavy, the contractor would be entitled to an adjustment of the contract price.

■ This interpretation is not inevitable, but it is at least as plausible as the sewage authority's interpretation, and in fact more so. Therefore the contract, despite its extraordinary length presumably designed to make explicit provision for every possible contingency, is ambiguous and extrinsic evidence was admissible to disambiguate it. *Patti v. Western Machine Co.*, 72 Wis.2d 348, 241 N.W.2d 158, 161–62 (1976); *Spencer v. Spencer*, 140 Wis.2d 447, 410 N.W.2d 629, 630–31 (App.1987); *Fidelity & Deposit Co. v.*

*City of Sheboygan Falls,* 713 F.2d 1261, 1271–72 (7th Cir.1983) (interpreting Wisconsin law). The sewage authority complains because the judge told the jury to decide whether the contract was ambiguous, rather than deciding himself. This was an error. The existence of ambiguity is an issue of law to be decided by the court, not an issue of fact to be decided by the jury. E.g., *Craigs, Inc. v. General Electric Capital Corp.,* 12 F.3d 686, 691 (7th Cir.1993). But the sewage authority was not hurt, for if the judge had retained the issue, as indeed he should have done, he could have made only one of two rulings: that the contract was unambiguous for Healy, or that it was sufficiently ambiguous to require that its meaning be resolved by the jury.

■■■ The sewage authority complains about the admission into evidence of a statement by its engineer that Healy's claim for a price adjustment under the differing site condition clause "probably has merit." Rule 408 of the Federal Rules of Evidence forbids the use of evidence of attempts to compromise a claim to prove the claim. The purpose of the rule is to facilitate the settlement of disputes by encouraging the making of offers to compromise. *Winchester Packaging, Inc. v. Mobil Chemical Co.,* 14 F.3d 316, 320 (7th Cir. 1994); *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir.1982); 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶¶ 408[01]–[02] (1986). The contract in this case contains a disputes clause, requiring submission to the engineer of "all claims by the Contractor arising from interpretation of or performance under the Contract Documents." The engineer "shall issue his determination," which the contractor may appeal to the sewage authority's executive director. The differing site condition clause describes requests for price adjustments under the clause as "claims," and the sewage authority believes that "claim" implies dispute. Not so. A dispute arises only when a claim is rejected at the initial or some subsequent level. Had the sewage authority accepted Healy's claim for a price adjustment, no dispute would have arisen. And it follows that until the rejection of that claim, no dispute *had* arisen. When the engineer remarked to Healy that its claim

probably had merit, the claim had not yet been rejected. There was not yet a dispute and Rule 408 was inapplicable. *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 830 F.2d 716, 724 n. 12 (7th Cir.1987); *In re B.D. Int'l Discount Corp.,* 701 F.2d 1071, 1074 n. 5 (2d Cir.1983).

■■■ The remaining issues relate to the jury instructions. The sewage authority complains, first, that the judge should not have refused to give its two instructions setting forth the theories of defense. The judge rejected them because they argued the facts. He was right to do so. The instructions are absurdly argumentative. Here is a brief excerpt from one: "The sewerage district and its engineers were careful to not interfere, hinder, or obstruct Healy's work. The sewerage district and its engineers recognized that Healy assumed the risk for all construction means, methods, techniques, and procedures, [as] ... agreed to by ... Healy and the sewerage district under General Condition 16 of the Contract. In addition, the contract provided the sewerage district and its engineers were not responsible for construction means, methods, techniques, or procedures, as set out in general condition 14 of the contract." These were not jury instructions; they were a trial brief. *United States v. Edwards,* 36 F.3d 639, 647 (7th Cir.1994); *United States v. Latham,* 754 F.2d 747, 750–51 (7th Cir.1985). The judge told the authority to redraft the instructions. It responded by deleting one sentence from one of them; the other it did not change at all. This response was unresponsive to the judge's legitimate request.

The authority has two complaints about the instructions the judge did give. One is that he failed to instruct the jury that it could award only damages that were foreseeable at the time the parties signed their contract. Actually he did so instruct them, the authority's complaint being that he *also* instructed them that it could award Healy damages for any losses that were the "natural and probable" consequence of the breach. The authority finds contradiction. We do not. There is little if any difference between "probable" and "foreseeable," or for that

matter between "unnatural" and "unforeseeable."

The authority's other complaint concerns the statement in the instruction on the duty to mitigate damages that the duty does not require a party to "take an unreasonable risk, subject itself to unreasonable inconvenience, incur unreasonable expenses, disorganize its business *or put itself in a position involving loss of honor and respect.*" The clause that we have italicized, though it is a correct statement of Wisconsin law, *Sprecher v. Weston's Bar, Inc.,* 78 Wis.2d 26, 253 N.W.2d 493, 501 (1977), and is supported by *Restatement (Second) of Contracts,* § 350(1) and comment g (1981), is intended for contracts for personal services, 11 Walter H.E. Jaeger, *Williston on Contracts* § 1353, p. 279 (3d ed. 1968), not for all contracts and certainly not for construction contracts. If the general counsel of a large corporation is wrongfully discharged, he is not required, in order to mitigate his damages, to take a job as a dishwasher. *Hussey v. Holloway,* 217 Mass. 100, 104 N.E. 471 (1914); *Canning v. Star Publishing Co.,* 130 F.Supp. 697, 700 (D.Del.1955); *Restatement, supra,* § 350, illustration 20. Our case involves a contract to build a sewer. There is no suggestion that the contractor, a corporation rather than an individual, would have lost "honor and respect" by taking steps to mitigate its damages. And we cannot imagine how any such steps could be thought to degrade or humiliate the corporation.

Healy's counsel admitted at argument that the part of the instruction on mitigation of damages that mentioned loss of honor and respect should not have been given. No matter. Healy never argued that it should have been excused from its duty to mitigate its damages because the performance of the duty would have caused it to lose honor and respect. When an instruction is given to which no evidence corresponds, the likely consequence is that the jury ignored it. The error in giving it is therefore presumed to have been harmless. *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1225–26 (7th Cir.1995); *United States v. Cartwright,* 6 F.3d 294, 301 (5th Cir.1993). The presumption was not rebutted here. The sewage authority argues that the evidence showed that Healy's project manager had exercised poor judgment and asks us to infer that the jury may have believed that it should excuse his failure to mitigate damages in order to spare him dishonor. The challenged instruction would hardly have pointed the jury in *that* direction. The project manager is not Healy. The instruction did not say that the jury might excuse a failure to mitigate in order to spare the feelings of the defendant's employee. Anyway there is no indication that the project manager would have suffered humiliation by taking proper steps to mitigate his employer's damages— those steps presumably would have *reduced* his humiliation.

AFFIRMED.