The HOME INSURANCE COMPANY, as Subrogee of the Northeast Illinois Regional Railroad Corporation, d/b/a Metropolitan Rail–Metra, Plaintiff–Appellant,

v.

The CHICAGO AND NORTHWESTERN TRANSPORTATION COMPANY, Defendant–Appellee.

No. 94–3385.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1995.

Decided May 23, 1995.

Gary Kostow, Henry R. Daar, Steven B. Fisher (argued), Kostow & Daar, Chicago, IL, for plaintiff-appellant.

George T. Brugess (argued), Richard A. Haydu, Chicago Northwestern Ry. Co. Law Dept., Chicago, IL, for defendant-appellee.

Before COFFEY and EASTERBROOK, Circuit Judges, and McDADE, District Judge.*

* Honorable Joe Billy McDade of the Central District of Illinois, sitting by designation.

COFFEY, Circuit Judge.

In 1990 four freight locomotive engines owned and operated by the Chicago and North Western Transportation Company (CNW) collided with and damaged two commuter passenger cars that CNW had leased from the Northeast Illinois Regional Commuter Railroad Corporation, doing business as Metropolitan Rail–Metra (Metra). Metra's insurer, Home Insurance Company (Home), brought this diversity action as subrogee of Metra against CNW, seeking to recover the replacement value of the destroyed commuter cars. The district court granted summary judgment in favor of CNW, holding that Metra and CNW's lease agreement limited CNW's liability to the casualty value of the destroyed cars. Home appeals, and we affirm.

## I. Background

CNW is engaged in the business of providing commuter and freight transportation services by rail in the Chicago metropolitan and suburban areas. In June 1977 CNW and Metra entered into an Equipment Purchase Agreement whereby CNW sold its commuter railroad equipment to Metra at the depreciated book value (casualty value). In an "Equipment Lease" dated six months later, CNW agreed to lease the same equipment back from Metra, and to retain and use the leased equipment "for the purposes of [CNW's] usual business as a Transportation Agency providing Public Transportation Services by rail...." The Equipment Lease also acknowledged that the parties had entered into "a Purchase of Service Agreement dated December 23, 1976, and effective as of July 1, 1975,[1] covering [CNW's] rail commuter service in the Chicago metropolitan region...."

Under Article X of the Equipment Lease entitled "Railroad Equipment Replacement Responsibility," the parties set forth the extent of CNW's responsibility in the event that any of the leased commuter rail equipment was destroyed during the term of the lease. Section 10.01 of the Lease provides:

> If any unit is destroyed, in whole or in part, from any cause whatever prior to the expiration of this Equipment Lease as to such Unit, [CNW] shall, at its option, either (a) repair or rebuild such Unit ..., or (b) pay to [Metra] an amount equal to the depreciated book value (herein called the "Casualty Value") which such would have had on [CNW's] books immediately prior to the destruction of such Unit ..., or (c) replace such Unit....

On January 27, 1990, a CNW freight crew was operating a freight train comprised of four locomotive engines and a number of freight cars at a depot near Crystal Lake, Illinois when the crew lost control of the four locomotive engines (which were coupled together). The freight locomotives traveled without a crew toward McHenry, Illinois until they crashed into two unoccupied commuter railroad cars Metra had leased to CNW. CNW admits that it was negligent in handling the freight locomotives and that its negligence was the proximate cause of the damage to Metra's commuter cars. The cost of replacing the destroyed passenger cars was approximately $1.5 million.

Thereafter, Home, Metra's insurer, paid Metra $1 million for the destroyed cars and brought a subrogation action against CNW in an attempt to recoup its loss. CNW filed an affirmative defense based on Section 10.01 of the Equipment Lease and attempted to credit Metra only the casualty value of the passenger cars, which was $61,000. Home countered that Section 10.01 was inapplicable because its application was limited to accidents caused by CNW's commuter operations, and contended that the section did not set forth the sole remedy available to Metra. The district court granted summary judgment in favor of CNW, holding that Section 10.01 of the Equipment Lease gave CNW the option of paying only the casualty value of the destroyed leased property. The court also noted that "[i]t is difficult to conceive of how the

---

1. From the stated dates of the Purchase of Service Agreement, it appears that the parties had a pre-existing legal relationship whereby CNW was to provide commuter transportation services for Metra. The copy of the agreement submitted by the parties does not clarify this ambiguity because it is dated October 1984.

parties to the Equipment Lease could have agreed to Section 10.01 contemplating that it not act as a limitation on CNW's liability for destruction in whole or in part of leased Units."

## II. Analysis

■ We review a grant of summary judgment de novo, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), viewing the record and the inferences drawn from it in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). We will affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). We apply the forum state's choice of law rules to determine what state's substantive law applies in this diversity action. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District, 50 F.3d 476, 478 (7th Cir.1995). CNW and Metra's Equipment Lease provides that the contract shall be construed in accordance with Illinois law. Illinois enforces contractual choice-of-law agreements such as the one contained in the Equipment Lease. See Maher and Associates, Inc. v. Quality Cabinets, 267 Ill.App.3d 69, 203 Ill. Dec. 850, 856, 640 N.E.2d 1000, 1006 (1994). Thus, Illinois law governs this action.

The issue in this case is whether Section 10.01 of the Equipment Lease limits CNW's liability to the casualty value of the destroyed commuter cars. Home argues that Section 10.01 is inapplicable because the Lease concerns "the conduct between Metra and CNW when CNW is providing commuter transportation services." Because the accident was caused by CNW's negligent freight operations, Home's argument continues, it is outside the scope of the parties' agreement. CNW counters that the parties intended to limit CNW's liability to the casualty value.

Whether Section 10.01 applies to limit CNW's liability is a matter of contract interpretation. In construing Section 10.01 and

determining the contractual intent, both parties relied mainly on CNW and Metra's two other agreements, the Equipment Purchase Agreement and the Purchase of Service Agreement, and both treated them as if they formed one single contract with the Equipment Lease. Particularly, CNW argues that the Equipment Lease and the other two documents must be read together because they refer to one another and "are dependent upon each other for performance of the mutual obligations contained in the contracts."

■ As a preliminary matter, we are convinced that the three agreements do not comprise one single contract, and therefore, need not be construed together. Under Illinois law, "where different instruments are executed at the same time between the same parties for the same purpose and in the course of the same transaction, all instruments must be read and construed together" as constituting but one single contract. McKown v. Davis, 118 Ill.App.3d 315, 73 Ill.Dec. 837, 839, 454 N.E.2d 1086, 1088 (1983); see also Bank of Chicago v. Park National Bank, 266 Ill.App.3d 890, 203 Ill. Dec. 915, 922, 640 N.E.2d 1288, 1295 (1994); Jones v. H.S. Weavers Underwriting Agency, 240 Ill.App.3d 574, 181 Ill.Dec. 343, 344, 608 N.E.2d 416, 417 (1992). In the factual situation before us, the three agreements were not executed contemporaneously or entered into in the course of the same transaction: the Equipment Purchase Agreement was dated June 1, 1977, the Equipment Lease was entered into on December 13, 1977, and assuming the accuracy of the dates contained in the Equipment Lease, the Purchase of Service Agreement was dated one year earlier on December 23, 1976 and was effective even earlier than the written contract date, on July 1, 1975. Compare Berkeley Properties, Inc. v. Balcor Pension Investors, II, 227 Ill.App.3d 992, 169 Ill.Dec. 576, 579, 592 N.E.2d 63, 66 (1992) ("When instruments are entered into simultaneously, they must be construed together"); First National Bank of Geneva v. Lively, 211 Ill.App.3d 1, 155 Ill.Dec. 636, 639, 569 N.E.2d 1247, 1250 (1991) (where a settlement agreement was executed contemporaneously with a release and a "mutual release" by the same parties

and the agreement referred to the two releases that would be executed as part of the settlement, the three writings formed a single contract); *Magnuson v. Schaider,* 183 Ill.App.3d 344, 131 Ill.Dec. 753, 762, 538 N.E.2d 1309, 1318 (1989) (in a sale of a tavern, where the parties executed simultaneously four different documents comprising of a stock purchase agreement, a purchase and sale agreement, a promissory note, and a lease of the tavern premises, the documents must be read together as essentially one contract). Moreover, the three documents cover three distinct legal relationships between Metra and CNW with distinct purposes. Although the Equipment Lease does not contain a full-integration clause and does make reference to the existence of the other two agreements, nowhere does it state or even suggest that the parties' obligations depend upon those two documents. Nor does it give any indication that it is meant to be construed with the other two documents as one single contract. Thus, the Equipment Lease, by itself, must be construed as a fully-integrated contract.

We move on, then, to interpret Section 10.01 of the Equipment Lease. In so doing, we must also decide whether the extrinsic evidence of CNW and Metra's Equipment Purchase Agreement and the Purchase of Service Agreement may nevertheless be considered. Under Illinois law, the primary objective in construing a contract is to give effect to the parties' intent. *Schek v. Chicago Transit Authority,* 42 Ill.2d 362, 247 N.E.2d 886, 888 (1969); *Kerton v. Lutheran Church Extension Fund,* 262 Ill.App.3d 74, 199 Ill.Dec. 416, 418, 634 N.E.2d 16, 18 (1994), and to discover this intent "the various contract provisions must be viewed as a whole." *Kerton,* 199 Ill.Dec. at 418, 634 N.E.2d at 18. Whether or when extrinsic evidence may be admitted to aid the court's determination of the contractual intent is a closer question. Many Illinois decisions, as well as our cases construing Illinois law, contain judicial language suggesting that extrinsic evidence is admissible only after the court first determines, from the writing itself, that the contract is ambiguous or incomplete. *See, e.g., Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 713 (7th Cir.

1993); *Occidental Fire & Casualty Co. v. Continental Bank,* 918 F.2d 1312, 1315 (7th Cir.1990) ("a court may consider extrinsic evidence concerning the meaning of contractual language only when the contract itself is ambiguous"); *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991); *LaSalle National Trust v. Village of Westmont,* 264 Ill.App.3d 43, 201 Ill.Dec. 725, 740, 636 N.E.2d 1157, 1172 (1994); *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill.App.3d 31, 195 Ill. Dec. 701, 704, 628 N.E.2d 1165, 1168 (1993); *In re Marriage of Osborn,* 206 Ill.App.3d 588, 151 Ill.Dec. 663, 668, 564 N.E.2d 1325, 1330 (1990); *A.A. Conte, Inc. v. Campbell–Lowrie–Lautermilch Corp.,* 132 Ill.App.3d 325, 87 Ill.Dec. 429, 432, 477 N.E.2d 30, 33 (1985). This so called four-corners rule holds that if a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over—no evidence outside of the contract may be considered. *See, e.g., Arrow Master, Inc.,* 12 F.3d at 713; *National Diamond Syndicate, Inc. v. United Parcel Serv., Inc.,* 897 F.2d 253, 256 (7th Cir.1990); *Air Line Stewards & Stewardesses Ass'n v. American Airlines, Inc.,* 763 F.2d 875, 877 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). *See also Weber v. DeKalb Corp., Inc.,* 265 Ill. App.3d 512, 202 Ill.Dec. 155, 160, 637 N.E.2d 694, 699 (1994) ("Under the four corners test, the court must find from the contract itself that the document is incomplete before we will allow the admission of extrinsic evidence."). However, this court, with ample support from Illinois cases, has also said that Illinois has largely rejected the "four corners rule," stating that "Illinois courts may look to extrinsic evidence in hope of discovering the principals' genuine intent" and parties will no longer "be stuck with the language of the agreements they sign, no matter their actual intent." *R.T. Hepworth Co. v. Dependable Ins. Co., Inc.,* 997 F.2d 315, 318 (7th Cir. 1993) (collecting cases). Still other cases have suggested that the admission of extrinsic evidence is not an all or nothing proposition and depends upon, to a certain extent, the division of functions between the court

and the jury. In *Sunstream Jet Express, Inc. v. International Air Service Co., Ltd.,* 734 F.2d 1258, 1267 (7th Cir.1984), which interprets Illinois law, we stated the general proposition that a "trial court must find a contract ambiguous, as a matter of law, before extrinsic and parol evidence is introduced at trial for consideration by the trier of fact." However, "[i]n determining whether an ambiguity exists ... the trial court may consider parol and extrinsic evidence." *Id.; see also URS Corp. v. Ash,* 101 Ill.App.3d 229, 56 Ill.Dec. 749, 754, 427 N.E.2d 1295, 1300 (1981) (a court "may admit evidence on a provisional basis to determine whether there is any ambiguity in the integrated contract."). Indeed, many Illinois cases have accepted the doctrine of "extrinsic ambiguity" which entitles parties to present evidence outside of the contract to show that although the contract appears to be clear to a typical reader of English, anyone who understood the circumstances in which the contract had been intended to apply would know that it does not mean what it seems to mean. *See, e.g., USG Corp. v. Sterling Plumbing Group, Inc.,* 247 Ill.App.3d 316, 186 Ill.Dec. 830, 832, 617 N.E.2d 69, 71 (1993); *Economy Preferred Ins. Co. v. Jersey County Construction, Inc.,* 246 Ill.App.3d 387, 186 Ill. Dec. 233, 235, 615 N.E.2d 1290, 1292 (1993); *Stamatakis Industries, Inc. v. King,* 165 Ill. App.3d 879, 117 Ill.Dec. 419, 424, 520 N.E.2d 770, 775 (1987); *Zale Construction Co. v. Hoffman,* 145 Ill.App.3d 235, 98 Ill.Dec. 708, 712, 494 N.E.2d 830, 834 (1986); *UIDC Management, Inc. v. Sears Roebuck & Co.,* 141 Ill.App.3d 227, 95 Ill.Dec. 691, 693, 490 N.E.2d 164, 166 (1986).

■ Recognizing the nature of the somewhat inconsistent lines of legal reasoning and interpretation, we have recently stated and held that these lines of cases can be reconciled. In *AM International, Inc. v. Graphic Management Associates, Inc.,* 44 F.3d 572, 574–76 (7th Cir.1995), we noted,

Rules of law are rarely as clear and strict as statements of them make them seem. So varied and unpredictable are the circumstances in which they are applied that more often than not the summary statement of a rule—the terse formula that judges employ as a necessary shorthand to prevent judicial opinions from turning into treatises—is better regarded as a generalization than as the premise of a syllogism.

The reason for the somewhat confusing lines of cases is that they were dealing with two different kinds of ambiguity. *See FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 621 (7th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990); *R.T. Hepworth Co.,* 997 F.2d at 318. A contract may be internally unclear or inconsistent as when it is "reasonably and fairly susceptible to more than one meaning," and thus, intrinsically ambiguous. *Lenzi v. Morkin,* 116 Ill. App.3d 1014, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1983); *see also ECHO v. The Whitson Co., Inc.,* 52 F.3d 702, 705 (7th Cir.1995). Or it may be extrinsically ambiguous, being clear on its face but someone who knows the context of the contract would know that the contract means something other than what it seems to mean. In that situation, we distinguish between "subjective" and "objective" evidence of ambiguity. "Subjective" evidence of ambiguity is "the testimony of the parties themselves as to what they believe the contract means," which is invariably self-serving, inherently difficult to verify and thus, inadmissible. *AM International, Inc.,* 44 F.3d at 575. Indeed, as we have cautioned before, most of the modern cases in the "four corners" line involve parties seeking to introduce subjective evidence of ambiguity, and these cases generally "stand for the unexceptionable proposition that 'language in a contract is not rendered ambiguous simply because the parties do not agree upon its meaning.'" *W.R. Grace & Co.,* 877 F.2d at 621 (quoting *Reynolds v. Coleman,* 173 Ill.App.3d 585, 123 Ill.Dec. 259, 267, 527 N.E.2d 897, 903 (1988)). "Objective" evidence, on the other hand, is evidence of ambiguity "that can be supplied by disinterested third parties," such as custom or usage of the trade. *AM International, Inc.,* 44 F.3d at 575. This kind of evidence is admissible because the ability of one of the contracting parties to fabricate such evidence is limited. *Id.* "Objective" evidence is admissible also because there is a further screen to protect the parties: the objective evidence of ambiguity must be presented first to the

judge, and only if the judge concludes that it establishes a genuine ambiguity is the evidence given to the jury. *Id.* at 575; *see also Sunstream Jet Express, Inc.,* 734 F.2d at 1267–68. Of course, there are also exceptions to the rule that only objective evidence can be used to alter the meaning of a clear contract, as when the parties agree to an idiosyncratic meaning, or when one party charges fraud. *AM International, Inc.,* 44 F.3d at 575–76.

▮ Keeping in mind the above standard, we must decide first whether the Equipment Lease is intrinsically ambiguous to allow the admission of the evidence of the parties' two other agreements. If the Lease is clear on its face, our next inquiry is to determine whether extrinsic evidence may nevertheless be admitted to contradict the plain meaning of the contract because it qualifies as "objective evidence" of ambiguity or because it establishes that the parties have agreed to attach idiosyncratic meanings to the terms of the contract. In determining whether the contract is intrinsically ambiguous, we will not add another term, about which the agreement is silent, to reach a more equitable result, nor can any word be deleted from the agreement to change the plain, ordinary meaning of the contractual terms. *See LaSalle National Trust,* 201 Ill. Dec. at 740, 636 N.E.2d at 1172; *see also Heller v. Equitable Life Assurance Society,* 833 F.2d 1253, 1255 (7th Cir.1987); *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.,* 395 Ill. 429, 70 N.E.2d 604 (1946).

▮ We are of the opinion that the Equipment Lease on its face unambiguously gives CNW the option to pay only the casualty value of the destroyed commuter cars. The parties' contractual limitation of damages, Section 10.01 of the Lease, provides:

*If any unit is destroyed, in whole or in part, from any cause whatever* prior to the expiration of this Equipment Lease as to such Unit, [CNW] shall, at its option, either (a) repair or rebuild such Unit ..., or (b) *pay to [Metra] an amount equal to the depreciated book value* (herein called the "Casualty Value") which such Unit would have had on [CNW's] books immediately

prior to the destruction of such Unit ..., or (c) replace such Unit....

(Emphasis added). The plain meaning of the phrase "if any unit is destroyed ... from any cause whatever" clearly encompasses the accident in this case. Two commuter cars CNW leased from Metra were destroyed, and it was stipulated that the accident was caused by CNW's negligent operation of its locomotives. Home argues that the phrase "any cause whatever" encompasses only those accidents that are related to CNW's commuter operations because the phrase must be interpreted within the context of the contractual purpose behind the Equipment Lease—namely, CNW's agreement to use the leased commuter equipment to provide commuter transportation services for Metra. Home conceded at oral argument that if instead of what happened here, the commuter cars had run into the locomotives due to CNW's negligent operation of the commuter cars, then CNW's liability would be limited to the casualty value of the destroyed cars. In support, Home cites *Halperin v. Darling & Co.,* 80 Ill.App.2d 353, 225 N.E.2d 92, 94 (1967), in which an indemnity provision contained in a vehicle lease provides that the lessee will indemnify the lessor from "any loss of liability whatsoever with respect to or arising out of or in the course of the operation of any truck leased hereunder...." Despite the broad phrase "any loss of liability whatsoever," the Illinois Appellate Court held that the provision did not bar the lessee's action alleging the lessor's negligence in maintaining the brakes of the leased vehicle.

The fallacy of Home's argument is that it is reading a limitation into Section 10.01 that is not contained in the very language of the contract. While CNW leased the commuter railroad equipment for the obvious purpose of performing commuter operations, it does not follow that the parties' limitation of liability agreement concerning the leased property must relate to "commuter operations." Nor does the very language of the contract contain such limiting language. Unlike the provision in *Halperin* which, as the Illinois Appellate Court held, specifies the circumstance under which the loss must occur—i.e. the loss must arise out of "the operation" of

the leased truck, *see id.* at 94, Section 10.01 does not say that CNW's liability is limited only when a unit is destroyed in an accident arising out of, or in the course of, CNW's commuter operations. Rather, its language is very broad and almost all inclusive, reading "any cause whatever prior to the expiration of this Equipment Lease." The purpose of this phrase, as can be reasonably ascertained from the parties' express words, is to cover not only the causes the parties could think of at the time of the contract but also any causes that could not be contemplated, so long as the accident occurred during the lease period. The parties, both of whom are sophisticated commercial entities, were free to make any limitation of liability agreement they desired.

Home also relies on *Leach v. Eychaner*, 1 Ill.App.3d 327, 273 N.E.2d 55 (1971), in which the Illinois Appellate Court held that a lessee's agreement to indemnify the lessor of a warehouse from "any and all" loss or damage arising out of any accident or occurrence "on or about the leased premises," did not protect the lessor from a tort action arising out of the lessor's negligent maintenance of a gasoline forklift truck the lessor had later leased to the lessee under a separate agreement, even though the accident occurred on the warehouse premises. However, *Leach* involved two distinct legal relationships: one is the lease of a warehouse, and the other is the lease of a truck. While the warehouse lease contained an indemnity provision protecting the lessor as the owner of the warehouse, it does not necessarily follow that the lessor was also protected as the owner of the truck. That is, the fortuitous event of the lessor being the owner of both the warehouse and the truck cannot shield it from liability for tort actions arising out of its negligent maintenance of the truck when the truck lease fails to contain an indemnification of that nature. Moreover, as the Illinois Appellate Court held, the parties could not have intended, at the time of executing the warehouse contract, to extend the conditions of the indemnity clause to cover a separate legal relationship entered into by the parties at a later date. *Id.* 273 N.E.2d at 58.

Unlike *Leach*, we are dealing with but one legal relationship between CNW and Metra concerning the lease of the commuter cars. The contractual language clearly evinces an intent to limit CNW's liability, no matter how the leased property is destroyed or damaged during the term of the lease, including any negligent acts by CNW. *Cf. Owens v. Midwest Tank & Manufacturing Co.*, 192 Ill. App.3d 1039, 140 Ill.Dec. 123, 126, 549 N.E.2d 774, 777 (1989) (although indemnity provisions are disfavored and must be strictly construed, they should be given effect where the intent of the parties to indemnify is clear and unambiguous). Whether CNW committed the negligent act while operating commuter cars—a scenario Home concedes would trigger Section 10.01—or freight cars is of no significance. The contract simply does not distinguish between CNW's freight and commuter operations for purposes of determining CNW's liability. The contract is not susceptible to more than one meaning, and thus is not intrinsically ambiguous.

Having determined that the Equipment Lease is clear on its face, we will now consider whether other extrinsic or objective evidence would give the contract a different meaning. The parties did not submit any relevant custom or usage of the trade to establish a latent ambiguity. Assuming CNW and Metra's two other agreements are evidence of the parties' course of dealing, and thus qualify as either "objective" evidence of ambiguity or evidence of the parties' agreement to attach idiosyncratic meanings to the Equipment Lease, the evidence fails to establish that the parties actually intended Section 10.01, the limitation of liability provision, to mean something other than what its plain meaning suggests. The Equipment Purchase Agreement is simply a contract whereby Metra agrees to purchase commuter railroad equipment from CNW. Similarly, the Purchase of Service Agreement does what its title suggests; it is a contract whereby CNW agrees to provide commuter transportation services for Metra. Although the contract contains a risk of loss provision concerning damage to CNW's or third parties' property and other claims by third parties, it does not concern the commuter railroad equipment CNW leased from Metra, much less impose a

limitation on Section 10.01 of the Equipment Lease. While the agreements show that the parties have a comprehensive arrangement for CNW to provide commuter operations for Metra using the equipment CNW had sold to and leased back from Metra, they simply do not suggest that the plain meaning of Section 10.01 should be construed differently. The district court's granting of summary judgment in favor of CNW was proper.

### III. Conclusion

The judgment of the district court is AFFIRMED.